**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION**

**UNITED STATES OF AMERICA,**

     **Plaintiff,**

                                   **Case No. 3:24-cr-00095-MCR**

**v.**

**DAVID DENVER HOLLAND,**

     **Defendant.**

_____/

<u>**DEFENDANT'S CLOSING ARGUMENT BRIEF**</u>

The defendant, DAVID DENVER HOLLAND, through his undersigned attorney, files this Closing Brief to Support his Amended Motion to Suppress. The defendant respectfully requests this Honorable Court to suppress all evidence stemming from the unconstitutional search and seizure of his person. In support of this question, the defense presents its argument for suppression below.

**I.**    **Factual Background**

Instead of completely reciting the facts, any relevant facts for the argument will be restated and appropriately cited in the document or exhibit referenced.

**II.**    **Argument**

    *A. Deputy Fetterhoff Did Not Possess Probable Cause for Fleeing and Eluding.*

First, the Defense raises the dispositive issue to all evidence it seeks to suppress: Deputy Fetterhoff did not possess probable cause for the fleeing and eluding charge.

Page 1 of 30

Because there was no probable cause, the evidence collected from the unlawfully searched BMW and evidence seized from Mr. Holland following his arrest on the Fleeing and Eluding arrest warrant must, as a matter of law, be suppressed.

Whether there is probable cause for the offense of fleeing and eluding is determined on: (1) "whether the law enforcement's lights were activated," and (2) "whether the defendant knew he or she was being ordered to stop by law enforcement" and (3) "whether the person chose to defy that order by failing to stop." *Ward v. State*, 59 So.3d 1220, 1223 (Fla. 4th DCA 2011).

The court in *Ward* took this language directly from the fleeing and eluding statute, Florida Statute Section 316.1935(2). Which in its relevant part is reproduced here:

> Any person who willfully flees or attempts to elude a law enforcement officer in an authorized law enforcement patrol vehicle, with agency insignia and other jurisdictional markings prominently displayed on the vehicle, with siren and lights activated commits a felony of the third degree . . .

> *Id. See also* Fla. Crim. Jury Inst. 28.7[1]

The crucial part of the *Ward* three-part analysis for probable cause is whether the suspect knows he is the individual signaled by lights and sirens to pull over.

In *Henderson v. State*, 88 So.3d 1060 (Fla. 1st DCA 2012), U.S. Marshalls requested assistance from local law enforcement to stop a vehicle driven by a suspect in an armed homicide. *Id.* at 1061. Two local deputies responded and caught up with the Marshall

---

[1] The Florida Bar, Criminal Jury Instructions Chapter 28, Fleeing to Elude a Law Enforcement Officer (Sirens and Lights Activated) https://www-media.floridabar.org/uploads/2023/02/28.7-revised.docx (accessed Feb. 14, 2025).

on the interstate. *Id.* at 1062. At that time, two deputies activated their lights and sirens and noted that both deputies were in marked official patrol vehicles. *Id.* One of the deputies testified that he could see the other officers' lights and hear sirens behind him. *Id.* Upon the deputies turning on their lights and sirens, the defendant slowed "as if to pull off on the grass shoulder" but continued driving for one to two miles. *Id.* When the defendant eventually stopped, and during his arrest, a firearm was found under the driver's seat. *Id.* The defendant sought to suppress the firearm, but the trial court denied this request. On appeal, the court found probable cause to stop the defendant because he did not stop when multiple deputies signaled the defendant to stop with their sirens and lights. *Id.* at 1063.

In a similar case to *Henderson*, the Fourth District Court of Appeals found sufficient probable cause to arrest the defendant for fleeing and eluding, regardless of the original reason for the attempted stop. *State v. Kirer*, 120 So.3d 60, 64 (Fla. 4th DCA 2013). In *Kirer*, the court found the defendant willfully continued to drive for one to two miles and disregarded the officer's lights, sirens, and directives to stop and pull even after using their P.A. system. *Id.* at 61. Most notably, the defendant knowingly disobeyed the directives to stop because the officer had lights and sirens on for approximately five minutes while maintaining two car lengths between the defendant and officer. *Id.* The court found that this purposeful decision to continue driving was sufficient probable cause to arrest him for fleeing and eluding. *Id.* at 64.

The suspect's knowledge that they are being ordered to stop is central to determine whether probable cause exists for fleeing and eluding. *Ward*, 59 So. 3d at 1223. An officer activating their lights indicates they are police officers. However, to assess the Fourth Amendment implications of police conduct, the officer's subjective intent is necessary "to the extent that intent has been conveyed to the person confronted." *Michigan v. Chesternut,* 486 U.S. 567, 575 (1988). Thus, the mere presence of lights and sirens without something to establish the intent to stop the suspect, the officer cannot establish that an individual chose to defy the order to stop.

While not fleeing and eluding in a vehicle, the facts in *Goodman v. State*, 280 So. 3d 537 (Fla. 2d DCA 2019) are analogous to the case at bar and explore the knowledge element. In *Goodman*, the defendant was riding on his bicycle at night when an officer observed that Goodman's bicycle did not have a light. *Id.* at 539. The officer, intending to issue a traffic infraction for the missing light, entered his patrol vehicle and followed Goodman with his lights on. *Id.* Goodman continued riding after briefly looking back at the patrol vehicle. *Id.* The officer then used his siren briefly to get Goodman to stop. *Id.* At no time did the officer call out or signal to Goodman on his bike that he was ordering Goodman to stop. *Id.*

Eventually, Goodman stopped and jumped off his bicycle. *Id.* Though he started walking away from the patrol vehicle, he immediately complied when the officer exited and directed Goodman to walk back to him. *Id.* The encounter continued, during which the officer frisked Goodman, leading to the discovery of contraband. *Id.* at 540. At the

Page 4 of 30

motion to suppress, the officer stated that "Goodman should have known that the officer was directing him to stop using his lights and sirens," though admitted that others were in the area. *Id.* at 539.

On appeal, the court held there was no probable cause to establish that Goodman fled from the officer through failing to stop his bicycle. *Id.* at 542. The court first pointed to the dearth of information on how long the officer followed Goodman or how long the sirens and lights were activated. *Id.* The court also noted that "an individual who flees must know of the officer's intent to detain him." *Id.* at 541 (citing *McClain v. State*, 202 So. 3d 140, 141 (Fla. 2d DCA 2016) (concluding that the defendant's conviction could not stand when he ran into his grandmother's duplex before the officer could order him to stop)); *S.B. v. State*, 31 So. 3d 968, 970 (Fla. 4th DCA 2010)("[A]lthough the evidence may reflect that S.B. was aware that he had caught the officers' attention when he began to flee, it does not prove that he had knowledge the officers intended to detain him.")).

The government cannot meet the probable cause facts outlined in *Ward v.* State. Deputy Fetterhoff did have his lights and sirens activated, but only for roughly 21 seconds. See Def. Ex. 1; 1:04 (on) 1:25 (off). But even this factor under *Ward* is not met because during the brief time the lights and sirens were on, there was approximately three-quarters to a full mile of distance and dozens of vehicles separating Fetterhoff's patrol vehicle from the BMW. To have probable cause that an individual is fleeing and

eluding, the lights and sirens must be activated, *and* the suspect must *know* he was being ordered to stop and *chooses to defy* that order by failing to stop.

Here, the government cannot establish that Mr. Holland, when lights were active, was being ordered to stop. Deputy McGhee, who could not recall whether she was in the other lane or directly behind Deputy Fetterhoff on the interstate, confirmed the BMW was nowhere near her or Fetterhoff when the lights and sirens were activated. Hr'g Tr. pg. 66, ln. 22 to pg. 67, ln. 1. The only time the officers were within four to five car lengths of the BMW was at the intersection of Wilde Lake and Pine Forest. Hr'g. Tr. pg. 67, ln. 12-21. But this is not when lights and sirens were active; in fact, Deputy Fetterhoff *waited over a minute* to initiate his lights and sirens. Def. Ex. 1.

Instead, Deputy McGhee testified the fleeing and eluding *began before* the lights and sirens were on—when the BMW began traveling at a high rate of speed and making "excessive lane changes" as the traffic merged onto Interstate 10. Hr'g. Tr. pg. 67, ln. 5. Deputy McGhee could not identify the BMW or the excessive lane changes in Defense's Exhibit 1. Hr'g. Tr. 42. ln. 4-14. But this is not the determining factor—the defendant's knowledge and choice to elude or flee is determined when lights and sirens are activated.

The facts above are much different from those in *Kirer* and *Henderson*. In both of those cases, officers followed behind the defendants within two or three car lengths with lights and sirens activated and for extended periods. In the present case, there was no close physical presence between the deputies or the BMW when lights and sirens were active. Further, Deputy Fetterhoff only activated his sirens for 21 seconds instead

of the five minutes that the siren and lights were active in *Kirer*. Unlike the clear knowledge of the defendants in *Kirer* and *Henderson,* who knew they were being directed to stop by officers, Mr. Holland could not know he was the car the deputies intended to stop.

Instead, the facts are like those found in *Goodman*. By turning on his lights and sirens, Deputy Fetterhoff only identified himself as law enforcement to other cars in the area. Without something more, such as getting behind a vehicle or ordering the person to stop over a PA system, anyone driving nearby would not know the officer's subjective intent in activating his lights. As in *Goodman*, multiple other cars were on the road when Deputy Fetterhoff activated his lights. But just as Mr. Goodman could not know the intent of the officer to signal him to stop his bicycle without something more, Mr. Holland could not know that he was the intended individual signaled to stop, especially when there was such a vast gap in distance and a short duration of siren and lights.

**Deleted:** like

Because Deputy Fetterhoff did not keep his lights and sirens on for an extended period, nor did he attempt to make it clear to Mr. Holland he was being ordered to stop, there was no way Mr. Holland could know he was being signaled to stop. Thus, no probable cause existed to believe Mr. Holland was knowingly and willfully fleeing and eluding. Therefore, the remedy for this violation of Mr. Holland's Fourth Amendment right to be free from unlawful search and seizures is the suppression of evidence that follows from the arrest warrant for fleeing and eluding.

*B. The BMW Was Within Curtilage and Thus is Protected from Warrantless Search and Seizure*

If the court does find that there was probable cause for the fleeing and eluding, the Defense argues that Deputy Fetterhoff and other officers with Escambia County Sheriff Office violated Mr. Holland's Fourth Amendment rights when they went into the protected curtilage to search the BMW.

1.  Holland Has Standing to Challenge the Search of the Vehicle

To have Fourth Amendment standing to challenge a search, a person must have a reasonable expectation of privacy in the place to be searched. *Minnesota v. Carter*, 525 U.S. 83, 88 (1998). "One who owns or lawfully possesses or controls property will in all likelihood have legitimate expectation of privacy by virtue of the right to exclude." *Byrd v. U.S.*, 138 S. Ct. 1518, 1530, 200 L. 2d 805 (2018). The driver of a borrowed car has a reasonable expectation of privacy. *U.S. v. Miller*, 821 F.2d 546, 548-49 (11th Cir. 1987). Even an unlicensed driver has a reasonable expectation of privacy in a vehicle he cannot lawfully operate but is in lawful possession of. *U.S. v. Cohen*, 38 F.4th 1364, 1370 (11th Cir. 2022).

In *U.S. v. Cohen*, the defendant was pulled over for running a stop sign. Cohen exited the vehicle and refused to re-enter after being directed to by law enforcement. *Id.* at 1366. Cohen was arrested for resisting without violence, at which time the officer learned Cohen's license was suspended. *Id.* The officer also learned that Cohen was driving a car rented to Cohen's girlfriend's mother but had her permission to drive the

car. *Id.* at 1367. Officers conducted an inventory of the car before towing it back to the rental company, at which time they discovered a firearm that Cohen acknowledged he knew about. *Id.* Cohen was then charged in federal court for being a felon in possession of a firearm. *Id.*

Cohen moved to suppress evidence obtained from the inventory search because the police had no legal basis to impound the car as it was legally parked. *Id.* The government responded to the motion arguing that he lacked standing to challenge the search because his license was suspended, and he was not an authorized driver on the rental agreement. *Id.* The district court agreed with the government, finding that Cohen had no reasonable expectation of privacy. *Id.*

On appeal, the court relied on the Supreme Court's recent decision in *Byrd v. United States*, which held that a driver, though not listed on a rental agreement, still has a reasonable expectation of privacy in a vehicle he is in lawful possession of. *Id.* at 1368 (citing *Byrd*, 138 S. Ct. at 1528-29). The court rejected the government's assertion that Cohen lacked standing "because he was an unauthorized *and unlicensed driver*" of the rental car. *Id* at 1368-69 (alteration in original). They held that a minor traffic infraction, such as driving without a license, excessively tinted windows, or expired registration tag, was not equivalent to the "wrongful presence that may eviscerate standing." *Id.* at 1370. Thus, Cohen had standing to challenge the search, though he was an unauthorized driver and did not have a valid driver's license. *Id.*

Page 9 of 30

Mr. Holland was in lawful possession of the BMW; he borrowed the car from Catherine Smith as she was using his truck. Hr'g. Tr. pg. 81. There is no evidence that Mr. Holland was not authorized to drive the BMW. The BMW was not reported stolen. Gov. Ex. 3. pg. 3. Mr. Holland was the sole occupant when Deputy Fetterhoff and Deputy McGhee saw him driving the BMW. Gov. Ex. 3, pg. 3. Mr. Holland's driver's license was indeed suspended at the time of the incident. Gov. Ex. 1. But like the court found for the defendant in *Cohen*, an unlicensed driver or expired tag cannot eviscerate standing to challenge an unlawful search.

Thus, Mr. Holland had a reasonable expectation of privacy in the vehicle as he was the sole driver at the time and had lawful possession of the BMW.

### 2.  The Vehicle Was Within Curtilage

The Fourth Amendment to the United States Constitution protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." "A backyard that is accessible only by walking around a side of a home is a place generally recognized as an area intimately linked to the home, both physically and psychologically, where privacy expectations are most heightened." *Florida v. Riley*, 488 U.S. 455, 452 (1989) (internal quotations omitted).

Factors the court must consider to determine curtilage include: (1) the proximity of the area claimed to be curtilage to the home, (2) whether the area is included within an enclosure surrounding the home, (3) the nature of the uses to which the area is put, and (4) the steps taken by the resident to protect the area from observation by people

passing by. *United States v. Dunn*, 480 U.S. 294 (1987). While these factors are useful analytical tools, the ultimate inquiry is whether the defendant reasonably may expect that the area in question should be treated as the home itself. *United States v. Hatch*, 931 F.2d 1478, 1480 (11th Cir. 1991) (quoting *Dunn*, 480 U.S. at 300).

In *Collins v. Virginia*, Officer McCall saw the driver of an orange and black motorcycle commit a traffic infraction. 584 U.S. at 589. The driver eluded the officer's attempt to stop the motorcycle. *Id.* A few weeks later, Officer Rhodes, a fellow officer of McCall, saw an orange and black motorcycle traveling above the speed limit, but the motorcyclist also eluded Officer Rhodes. *Id.* Officers McCall and Rhodes compared notes and concluded the two incidents involved the same motorcyclist. *Id.* Officers then learned the orange and black motorcycle was likely stolen and in the defendant's possession, Mr. Collins. The officers confirmed Facebook pictures of Collins with the motorcycle. *Id.* Officer Rhodes then tracked down the house's address pictured in the Facebook photos, which belonged to Collin's girlfriend, but where Collins stayed multiple nights per week. *Id.* Officer Rhodes parked on the street and saw what he believed to be a motorcycle covered with a tarp parked within the covered driveway. *Id.* at 590. The driveway in question sat partially behind the front perimeter of the house, "enclosed on two sides by a brick wall about the height of a car and on a third side by the house." *Id.* at 593.

In the Court's analysis of whether the motorcycle was within the home's curtilage, the Court noted that a "visitor endeavoring to reach the front door would

have to walk partway up the driveway but would turn off before entering the enclosure" of the driveway. *Id.* Following the precedent of *Florida v. Jardines*, 569 U.S. 1 (2013), the Court found that the driveway enclosure where Officer Rhodes searched was within curtilage. *Id.* The Court also rejected the state's assertion that the warrant exception for automobiles allowed Officer Rhodes to search the motorcycle regardless of whether it was within curtilage. *Id.* at 594-95. The Court reasoned that extending the warrant exception for automobiles to vehicles within curtilage would undermine the Fourth Amendment's core protection against unreasonable searches. *Id.* at 595.

In Mr. Holland's case, the officers circumvented the driveway and walkway to the front door. Hr'g. Tr. pg. 18. Deputies Fetterhoff, McGhee, and Smith all accessed the BMW through the backyard gate, across the length of the backyard, and into the carport area to search the vehicle. The Court in *Collins* definitively found that "when a law enforcement officer physically intrudes on the curtilage to gather evidence, a search within the meaning of the Fourth Amendment has occurred . . . . [s]uch conduct thus is presumptively unreasonable absent a warrant."584 U.S. at 593.

The defense would also draw the court's attention to a case the government cites out of the Eighth Circuit in its motion to support its assertion that Holland's backyard was not within curtilage. *U.S. v. Wells* 648 F.3d 671 (8th Cir. 2011) Despite the government's attempt to distinguish *Wells*, *Wells* is factually identical to the curtilage situation in the present case.

In *Wells*, officers drove past the defendant's house in response to a tip that the house was being used to manufacture methamphetamine. *Id.* at 673. The house sat on a corner lot with a home in the front of the lot and a shed observable from the corner of the lot. *Id.* Officers observed an open back door of the house and an open door of a shed in the backyard. *Id.* Officers then decided to conduct a "knock and talk" but instead of going up the paved front walk to the front door, they went around the corner to the dirt driveway that led into the backyard. *Id.* Officers used this path to enter the backyard and looked through the shed before viewing a light in a previously unobserved outbuilding. *Id.* They approached and knocked on the outbuilding door which the defendant opened at which time the officers saw large quantities of marijuana and methamphetamine. *Id.* at 674.

The defendant was arrested, and officers obtained a search warrant based on their view of the contraband. *Id.* Wells moved to suppress the evidence seized pursuant to the warrant, arguing that the "knock-and-talk" violated the protected curtilage of his backyard." The district court granted Well's motion noting that the "backyard area was fenced in on three sides and that except for the narrow unpaved driveway leading to the shed, the backyard could not be viewed from the street" and thus Wells had a reasonable expectation of privacy protected from warrantless searches. *Id.*

On appeal, the court agreed with the district court's determination that the backyard was protected curtilage. *Id.* at 679. They pointed to the facts that the officers did not approach the home from the traditional area for a "knock and talk," the front

walk to the front door, instead going around the corner to the unpaved driveway. *Id.* at 677. Further, they found ample evidence that there was "intimate activity associated with the sanctity of the [the defendant's] home and privacies of life." *Id.* These included wagons, sleds, a boat, lawnmowers, and burn barrels, among other "domestic objects of one's lawn." *Id.*

In the case of the backyard of 303 W. Hope Drive, we have the same evidence of intimate association with the home. The backyard had a shed full of tools. The BMW was parked within five feet of the carport, which was similarly full of tools, a lawn mower, storage boxes, and electrical cords, all the type of domestic objects that intimately associated the use of the backyard with the home. Def. Mot. Supp. Ex. B. Importantly, the lengths the officers in *Wells* took to access a view of the occupied outbuilding in the backyard are exactly the actions of Fetterhoff on February 20th. He walked around the corner and accessed an unpaved drive in the backyard to view the BMW. This is the same unlawful intrusion into curtilage that the court found to violate Well's rights. Similarly, the subsequent search of the BMW and evidence found on February 28, 2024, should be suppressed.

The *Wells* court rejected the government's argument that the deputies conducted a traditional "knock and talk" when they entered the backyard through the dirt path. The analysis should be the same here. Deputy McGhee testified that it was highly unusual for law enforcement to park in a home's driveway to investigate. Hr'g. Tr. pg. 63, ln. 13-22. Following the reasoning of *Wells* and *Collins*, an officer who goes outside

of the ordinary places where the average member of the public walks to speak with a home resident violates curtilage.

Deputy McGhee's testimony confirms this traditional understanding of curtilage. She testified that she had executed a search warrant on a residence and that if the search warrant contained the traditional language of "any and all vehicles or outbuildings within the curtilage of the residence", she would search those places as well. Hr'g. Tr. pg. 52, ln. 6-13. Deputy McGhee confirmed that if she had been executing such a search warrant on 303 W. Hope Drive, the BMW would "have search[ed] the vehicle" because it was "part of the property" of the warrant." Hr'g. Tr. pg. 52, ln. 14-25. She ultimately agreed the car "was within curtilage." *Id.*

The government also cites several cases that are distinguishable from the facts in the case at bar. For example, they cite *U.S. v. Stephen*, 823 Fed. Appx. 571, where a defendant argued that law enforcement violated curtilage when they arrested him in a driveway. However, the driveway in question was part of a street of duplexes, and thus, it was not the type of area intimately associated with the home and openly used by other residents.

Furthermore, the government also asserts that the area where the BMW was found was not within curtilage because (1) the back gate was open and (2) a small portion of the fence was down for repair. However, this eviscerates curtilage protections.

Page 15 of 30

First, an open backyard gate does not destroy curtilage. Counsel for the defendant has only found case law that addresses a *front* gate. For example, in *U.S. v. Holmes,* the front yard enclosed in a chain link fence and front gate with a no trespassing sign is within the "knock and talk" area that is not considered curtilage. *U.S. v. Holmes*, M.D. Florida, 2014 U.S. Dist. LEXIS 184961; *see also U.S. v. Treffinger*, N.D. Florida, 2017 U.S. Dist. LEXIS 98464 (finding that an open gate to the front door was within the curtilage exception because it is the natural place where visitors usually go to speak with the home's occupant).

Secondly, the government's assertion that a part of the 303 W. Hope fence was down for repair as evidence of no curtilage supports the defense's argument on the fourth *Dunn* factor. To determine curtilage, the court looks at the efforts to enclose and protect the backyard from public view. The evidence clearly shows that the section of the down fence was actively being repaired when deputies arrived on the scene. Hr'g. Tr. pg. 84, ln. 23-24. This strengthens the defense's argument that the privacy fence was to keep the public from viewing the backyard. Additionally, the section of the fence that was being repaired was the one on the corner of W. Hope and Las Vegas—the section with the most exposure to the public view. Thus, the government's assertion that this destroys curtilage does not comport with the fourth *Dunn* factor, which shows the occupant's attempt and intent to shield the backyard from public view.

*C. None of the Exceptions to the Exclusionary Rule Apply to this Case*

The exclusionary rule for Fourth Amendment violations encompasses both "primary evidence obtained as a direct result of an illegal search or seizure" and "evidence later discovered and found to be derivative of an illegality," the so-called "fruit of the poisonous tree." *Segura v. United States*, 468 U.S. 796, 804 (1984). The defense argues that no exceptions to the exclusionary rule apply in this case. Additionally, "[the] exclusionary rule was adopted to deter unlawful searches by police, not to punish the errors of magistrates and judges." *Illinois v. Gates*, 462 U.S. 213, 263 (1983). The defense respectfully submits that this is a case where law enforcement acted unlawfully. It is not lost on the defense or the court that the Government has not called the leading actor in this case, Deputy Fetterhoff. He is the sole law enforcement officer who:

- Was the affiant for the fleeing and eluding arrest warrant issued on February 21, 2024; *see* Gov. Ex. 3, pg. 7

- Physically intruded into the backyard of 303 W. Hope Drive on February 20, 2024, to search the vehicle;

- Was the affiant who sought the search warrant for the BMW on February 28, 2024; *see* Gov. Ex. 4.

- Was the affiant for the arrest warrant for various narcotic offenses stemming from the February 28th search of the BMW; *see* Gov. Ex. 5

Page 17 of 30

- Arrested Mr. Holland on March 14, 2024, on the active felony warrants in Government's Exhibits 3 and 5.

This series of events establishes a causal chain, with Deputy Fetterhoff as the only link between each unconstitutional act.

### 1. Independent Source Doctrine

There are two possible applications of the independent source doctrine that the government claims apply in this case. First, they argue that the February 28th search warrant for the BMW provided an independent source of evidence found in the BMW. Second, the government argues that the arrest warrants for fleeing and eluding issued on February 21st were a similarly independent source for the drugs allegedly found on Mr. Holland during his arrest on March 14th.

The independent source doctrine deems evidence admissible if the prosecution can show that it derived from a lawful source independent of the illegal conduct. *U.S. v. Somers*, 591 Fed. Appx. 753, 756 (11th Cir. 2011). To salvage a search warrant based on unconstitutional conduct under the independent source doctrine, there is a two-part analysis: (1) whether, after excising from the search warrant affidavit information gained during the illegal entry, the remaining information supported a finding of probable cause, and (2) whether the officer's decision to obtain a search warrant was "prompted by" what he observed during the illegal entry. *U.S. v. Barron-Soto*, 820 F.3d 409, 414 (11th Cir. 2016).

i.  Search Warrant for the BMW

When applying this analysis to the search warrant affidavit for BMW, the independent source doctrine does not apply. First, the curtilage violation requires removing all information that Deputy Fetterhoff obtained while in the backyard of 303 W. Hope Drive. This would be all the "plain view" observations of the "evidence" inside the car. This evidence is in the affidavit: "multiple boxes of sandwich bags" and "multiple cellphones . . . in the driver's door." Gov. Ex. 4, pg. 4, ¶ 3 and 4. Deputy Fetterhoff alleges that these cellphones are technology used for criminal acts such as fleeing and eluding. Gov. Ex. 4, pg. 4, ¶ 4. The stated purpose of the search warrant was to collect evidence "to identify suspects." Gov. Ex. 4, pg. 5. There is no nexus between the presence of multiple cellphones and fleeing and eluding beyond Deputy Fetterhoff's bare assertions.

Excising this information from the search warrant affidavit makes the affidavit devoid of probable cause to seize and search the vehicle. Removing the curtilage violation from the search warrant removes the probable cause between the alleged fleeing and eluding and the vehicle. Thus, the analysis could stop here because there is no probable cause for searching the vehicle. However, the second prong was also not allowed because the decision to seek the search warrant was based solely on the items he viewed in the car from within curtilage.

This fact pattern is analogous to the one in *United States v Fuqua*. 2016 U.S. Dist. LEXIS 193758. In that case, the Northern District of Alabama district court held that

Page 19 of 30

a search warrant obtained after an unconstitutional search must be suppressed as it was insufficiently separated from the illegal search. There, local law enforcement accompanied a fire department official to search the defendant's nightclub under the pretense of code enforcement. *Id.* at *5-6. An officer observed firearms in the club, which was owned by the defendant, who was a known felon to law enforcement. *Id.* at *13. Immediately upon observing the firearms, law enforcement informed an ATF agent who submitted a search warrant affidavit. *Id.* The affidavit included only the observations of law enforcement of the presence of guns. *Id.* at *14. The district court found the officer's search was unreasonable under the Fourth Amendment. *Id.* at *29. Therefore, under the exclusionary rule, the ATF search warrant and the evidence collected from the warrant must be suppressed because the affidavit contained no independent information about the defendant's illegal conduct that cleared the warrant from the taint of the original violation. *Id.* at *31.

It should also be noted that Deputy Fetterhoff's affidavit contained false and misrepresentative facts to the duty judge. Fetterhoff stated he "maintained a visual of the vehicle" from the time Holland entered the BMW at the Red Roof Inn to when Fetterhoff attempted to stop the BMW on the interstate. Gov. Ex. 4, pg. 3. This is false, as shown in the dashcam footage from Deputy Fetterhoff's vehicle. Furthermore, the BMW was parked in the rear of the Red Roof Inn and the sworn testimony of Deputy McGhee states Deputy Fetterhoff was "across the street" (from the front of the Red Roof Inn) Hr'g. Tr. pg. 11, ln. 4-6; ln. 12-16.

The defense would also reject any assertion that independent source doctrine should apply because Florida law and Sheriff's Office policy permitted them to seize the vehicle as evidence of a felony. Hr'g. Tr. pg. 71, ln. 18-20. While it is true that Florida Statue Section 932.703(2) gives law enforcement an avenue to seize a vehicle on private property as evidence of a felony, the law must still comply with the Fourth Amendment and due process. *See Florida v. White*, 526 U.S. 559 (1999).

The defense would also raise its earlier argument that the K9 sniff of the car within the curtilage directly violated the holding in *Jardines,* Def. Mot. Supp. ¶ 27. It should similarly be removed from the affidavit.

ii.  Arrest Warrant for Mr. Holland

A similar analysis takes place for the two arrest warrants for Mr. Holland. The first warrant issued for fleeing and eluding was not based on probable cause, as evidenced by the Fetterhoff dashcam video. The second arrest warrant is entirely based on the unlawful search and seizure of the BMW. *See* Argument C(1)(i).

The government argued in its response that Deputy Fetterhoff had probable cause on February 21st to get the arrest warrant for fleeing and eluding. Still, as described in the first section of closing arguments, there was no probable cause for fleeing and eluding. Again, the defense raises the unique nature of the violations in this case as all

perpetuated by Deputy Fetterhoff. This pervasive and continuous taint through one individual makes independent source doctrine inappropriate to apply in this case.[2]

      2.  <u>Automobile Exception, Hot Pursuit, Attenuation</u>

      i.  Automobile Exception

The automobile exception to the warrant requirement does not allow an officer to enter the curtilage to search a vehicle. *Collins v. Virginia*, 584 U.S. 586, 594 (2018). The automobile exception extends no further than the automobile itself. *Id.* To allow an officer to enter a home or its curtilage to access a vehicle without a warrant would undermine the core of the Fourth Amendment protection afforded to the home and its curtilage and "untether" the automobile exception from the Supreme Court's careful justifications for the exception. *Id.* at 594-95.

Deputy Fetterhoff drove his patrol vehicle into the backyard and looked into the BMW multiple times. Hr'g. Tr. pg. 55. Deputy Smith similarly violated the Fourth Amendment when he ran the K9 Heist around the BMW. Following the precedent of *Collins* and *Jardines*, Deputy Fetterhoff could not enter the curtilage to view the BMW as the mere intrusion into the curtilage was sufficient to violate the Fourth Amendment.

      ii.  Exigent Circumstances or Hot Pursuit

"Under the hot pursuit doctrine, police officers may enter premises without a warrant [while] in hot pursuit of a fleeing suspect. *United States v. King*, 634 F. Appx. 287,

---

[2] Defense expands this argument in its discussion of *Leon* in section C (3).

289 (11th Cir. 2015). For the hot pursuit exception to apply, the defendant's pursuit must be immediate and continuous from a crime scene or some threat to public safety. *Welsh v. Wisconsin*, 466 U.S. 740, 753-754 (1984). "While the flight need not be reminiscent of the opening scene of a James Bond film, there must be 'be some sort of a chase.'" *Lange v. California*, 594 U.S. 295, 329 (2021) (quoting *United States v. Santana*, 427 U.S. 38, 43 (1976)).

The Eleventh Circuit addressed hot pursuit in *United States v. King*, 634 Fed. Appx. 287, 288 (11th Cir. 2015). In *King*, Deputy May testified that while looking for a stolen car of a victim who had been carjacked, individuals in a Dodge Charger appeared to be counter-surveilling May's police cruiser. *Id.* at 290. After circling May several times, the Dodge Charger eluded Deputy May by going 85 to 90 miles per hour in a residential area. *Id.* Deputy May did not initiate the traffic stop due to the vehicle's high speed but continued to patrol the area for 10 minutes, looking for the Charger. *Id.* Deputy May then saw the vehicle parked in a driveway and pulled into the driveway to speak to the home's resident. *Id.* There was no fence or trespassing sign at the beginning of the driveway. *Id.* at 291.

The court held that Deputy May did not violate the Fourth Amendment when he entered the home's curtilage because he was in "immediate and continuous pursuit of the Dodge Charger" from an attempted traffic stop. *Id.* at 290. Further, the court found that because May did not deviate from the driveway to speak with the home's residents, the intrusion onto the property was not unreasonable. *Id.* This conduct fell

within the "knock and talk" exception to violating curtilage, allowing a law enforcement officer to walk up and to the front door as any other "typical citizen in the United States" would who wanted to get information from a resident. *Id.* at 291.

No exigent circumstances were present to justify Deputy Fetterhoff's intrusion into 303 W. Hope Drive's backyard. First, no temporal link existed between the "pursuit" of the BMW on the interstate and the law enforcement's arrival at 303 W. Hope Drive. An hour and a half passed between the alleged fleeing and eluding on the interstate and the officers' arrival at 303 W. Hope Drive. This is vastly different from when Deputy May observed the car in *King*.

Importantly, in *King,* Deputy May acted lawfully when he walked up the driveway and front walk to speak to the residents. When the officer in *Collins* went off the "knock and talk" exception to take pictures of the motorcycle, curtilage was violated. In the present case, Deputy McGhee testified that Deputy Fetterhoff went right to the backyard and gate. Hr'g Tr. pg. 18. Deputy McGhee did not knock on the front door to inquire if anyone was home or to get permission to access the backyard. Hr'g Tr. pg. 61. This clearly shows that not only were there no exigent circumstances that permitted Deputy Fetterhoff to enter the backyard, but no effort was made to access the backyard through consent or by seeking a warrant lawfully.

### iii.  Attenuation Doctrine

The exclusionary rule for Fourth Amendment violations does not apply in cases when the link between the unconstitutional conduct and the discovery is too attenuated

to justify suppression. *Utah v. Strieff*, 579 U.S. 232, 235 (2016). Whether attenuation doctrine applies is based on three prongs of analysis: (1) the temporal proximity between the unconstitutional conduct and the discovery of evidence, (2) any intervening circumstances, and (3) "*particularly significantly*," the purpose and flagrancy of the official misconduct. *Id.* at 239.

In *Utah v. Strieff*, a narcotics officer illegally detained Mr. Strieff after observing him exiting a house believed to be involved in drug sales. *Id.* The Supreme Court found that though no reasonable suspicion existed to stop Strieff, the discovery of a valid, active warrant for Strieff's arrest was an "intervening" fact that severed the original violation from the discovery of evidence during a search incident to arrest. *Id.*

The first prong is not helpful in determining attenuation because the period between the arrest warrants and search of the BMW and the March 14th arrest took place over a month. The second prong does not establish any intervening events because Deputy Fetterhoff was present at each investigation stage. This is vastly different from the facts in *Strieff,* where the arrest warrant "was entirely unconnected to the stop." *Id.* at 240. While two arrest warrants were out for Mr. Holland's arrest, both were the direct result of Deputy Fetterhoff's Fourth Amendment violations.

The final prong heavily favors suppression, as Deputy Fetterhoff's activities throughout the investigation show a purposeful and flagrant pattern of misconduct. Deputy Fetterhoff's actions cannot be the same "negligent" acts in *Strieff.* As discussed previously, Fetterhoff omitted crucial facts and misrepresented information in the

fleeing and arrest warrant. He similarly misrepresented the time between the fleeing and

eluding and the discovery of the BMW and its location in relation to the home. Deputy

Fetterhoff's actions in this case were for the impermissible purpose "that something

might turn up." *Brown v. Illinois*, 422 U.S. 590, 605 (1975).


3.  *Leon* Good Faith Exception

While *Leon* is often the *deus ex machina* for law enforcement's reliance on judicially

approved warrants, "but the good-faith exception does not apply when the magistrate

or judge in issuing a warrant was misled by information in the affidavit that the affiant

knew was false or would have known was false except for his reckless disregard for the

truth." *U.S. v. Martin*, 297 F.3d. 1308, 1313 (11th Cir. 2002).

The defense argues that this is one of those rare cases. Deputy Fetterhoff

knowingly omitted crucial information from the arrest warrant for the fleeing and

eluding by failing to say how closely he followed the BMW and for how long. He also

included materially false information stating the fleeing and eluding "occurred at the

intersection of Pine Forest Road and Wilde Lake Boulevard," Gov. Ex. 4, pgs. 1, 3. He

purposefully obfuscated the timeline of the alleged offenses and crucially failed to state

when and for how long he had lights and sirens activated. See Gov. Ex. 4, pg. 3. The

same can be said for the search warrant for the BMW. Nowhere in the affidavit does

Fetterhoff specify where the BMW was located at 303 W. Hope Drive, the time

separating the incident on the interstate and the deputies' arrival at the address. This is all crucial information that Deputy Fetterhoff hid and misrepresented to the judge.

The defense raises the question of whether a law enforcement officer can reasonably rely on "good faith" in the legal sufficiency of warrants he drafted and then executed. In *Groh v. Ramierz*, the Supreme Court rejected an officer's claims on a good faith reliance on a search warrant for a home "because petitioner himself prepared the invalid warrant, he may not argue that he reasonably relied on the Magistrate's assurance that the warrant contained an adequate description of the things to be seized and was therefore valid." 540 U.S. 551, 564 (2004).

The purpose of the exclusionary rule "is to deter future Fourth Amendment violations," *Davis v. U.S.*, 564 U.S. 229, 236 (2011), and not "to punish the errors of judges and magistrates." *Leon*, 468 U.S. at 916 (1984). An essential part of this determination is whether law enforcement know or should have known that their conduct was constitutional. *See Herring v. U.S.*, 555 U.S. 135, 143 (2009) (citing *Illinois v. Krull*, 480 U.S. 340, 348-49 (1987)). Their conduct is based on the "reasonableness standard on whether an officer would have known the search was illegal in light of the circumstances." *Id.* at 145.

Defense argues that both Deputy Fetterhoff and McGhee knew the car was within curtilage and a warrant was required. Hr'g. Tr. pg. 55 & 63. Additionally, a reasonable officer in Fetterhoff's position would know that information regarding the distance and timing of pursuing a vehicle with lights and sirens on is essential for a judge

Page 27 of 30

to determine probable cause. When Fetterhoff omitted this information and misrepresented essential facts, he actively misled the judge into making a probable cause finding. In total, this willful and knowing violation of the Fourth Amendment makes this a clear case in which exclusion of the evidence is necessary to deter future misconduct.

### Conclusion

The constitutional protections afforded by the Fourth Amendment are not mere formalities but critical safeguards against unlawful government intrusion. In this case, Deputy Fetterhoff's conduct in asserting probable cause for fleeing and eluding charge and subsequently entering the curtilage of 303 W. Hope Drive to search the BMW represents a blatant disregard for those protections.

First, the government has failed to establish probable cause for the charge of fleeing and eluding. The legal standard requires that an individual knowingly and willfully defy an officer's order to stop. Yet, the facts unequivocally show that Mr. Holland was not given a clear directive to stop, nor could he have reasonably known that he was the intended target of the brief and distant activation of Deputy Fetterhoff's lights and sirens. Unlike in *Kirer* and *Henderson*, where law enforcement closely followed defendants with activated lights and sirens for extended periods, the brief, remote, and ambiguous nature of the alleged pursuit in this case fails to meet the legal threshold for probable cause.

Second, even if probable cause for fleeing and eluding were established, the subsequent warrantless entry into the backyard and search of the BMW violated Mr. Holland's Fourth Amendment rights. The BMW was parked within the home's curtilage, an area constitutionally protected from warrantless searches. The law is clear; officers cannot circumvent the warrant requirement by unlawfully intruding into a protected area. *See Collins v. Virginia*, 584 U.S. 586 (2018); *Florida v. Jardines*, 569 U.S. 1 (2013). Here, officers deliberately bypassed the front entrance and accessed the backyard without a warrant, mirroring the unconstitutional conduct in *Wells*. Their actions, including running a drug-sniffing K9 around the vehicle, constituted an unreasonable search and seizure.

Moreover, none of the exceptions to the exclusionary rule apply. The independent source doctrine cannot salvage the search because the affidavit for the warrant was tainted by the initial Fourth Amendment violations. The automobile exception does not extend to a vehicle within curtilage. The hot pursuit doctrine does not apply, as there was no immediate and continuous chase from the scene of a crime. And the attenuation doctrine fails because the entire investigation was built upon a foundation of unconstitutional conduct. Finally, the *Leon* good faith exception cannot be invoked when the officer seeking and executing the warrant because Deputy Fetterhoff intentionally omitted key facts and misled the issuing judge.

This case presents an example of why the exclusionary rule exists—to deter unlawful police conduct. If courts allow evidence obtained through such flagrant

Page 29 of 30

violations to stand, they sanction disregard for constitutional rights and erode the protections that form the bedrock of our legal system. Because Deputy Fetterhoff lacked probable cause for the initial stop and his subsequent conduct was unconstitutional, all evidence obtained must be suppressed as a matter of law.

WHEREFORE, the defendant, DAVID DENVER HOLLAND, respectfully requests that this Court grant his motion to suppress evidence.

### LOCAL RULE 7.1(F) CERTIFICATE

I HEREBY CERTIFY that the above memorandum complies with the word limit in N.D. Loc. R. 7.1(F) because this memorandum contains 7,716 words, excluding parts exempted by the rule.

RESPECTFULLY SUBMITTED this 25th day of February 2025.

_____
JOHN L. WILKINS
Florida Bar No. 137529
Attorney for Defendant
220 E Government Street
Pensacola, FL 32502
(850) 429-9757
jackatlaw@yahoo.com