**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**PENSACOLA DIVISION**

**UNITED STATES OF AMERICA**

**v.**                                             **CASE NO. 3:24-cr-95-MCR**

**DAVID DENVER HOLLAND**

_____/

## ORDER

On October 15, 2024, a federal grand jury returned a four-count indictment against Defendant David Denver Holland on a multitude of drug trafficking and weapons charges. *See* ECF No. 1.  Holland has moved to suppress the bulk of the evidence against him, arguing that it was obtained from, or is derivative of, the Escambia County Sheriff's Office's unlawful trespass onto the curtilage of his home. Specifically, Holland claims that the sheriff's deputies violated the Fourth Amendment when they—without a warrant—drove a marked patrol car into his backyard, deployed a trained police dog to search for narcotics, and towed a vehicle believed to contain drugs from the area around his home. *See* ECF No. 33.[1]  Holland further contends that the warrants subsequently issued for his arrest were tainted by the unconstitutional search of his home and, in any event, not supported by probable

---

[1] On February 5, 2025, Holland filed the operative motion, which slightly amended his original motion to suppress, ECF No. 24.

cause. *Id.* After careful consideration, and with the benefit of an evidentiary hearing and subsequently submitted dash and body camera footage, the Court will grant Holland's motion.[2]

## I.    Background

The morning of February 20, 2024, Escambia County Sheriff's Deputies Augustus Fetterhoff and Raven McGhee were running tags and looking for suspicious or stolen vehicles in hotel parking lots near the intersection of Wilde Lake Boulevard and Pine Forest Road in Pensacola, Florida.  A black 2019 BMW 540i parked behind the Red Roof Inn caught Deputy Fetterhoff's eye.  The vehicle's tags did not appear to match available records, and its VIN number reflected that its registered owner, a woman named Catherine Smith, had an outstanding warrant for her arrest on drug charges.  Deputy Fetterhoff radioed his findings to Deputy

---

[2] At the evidentiary hearing on February 6, 2025, the Court heard testimony from Deputy Raven McGhee and Lieutenant Walter Matthews from the Escambia County Sheriff's Office as well as from Holland.  The Government also introduced a snippet of the dashcam footage from Escambia County Sheriff's Deputy Augustus Fetterhoff's patrol vehicle, *see* ECF No 34-3, but Deputy Fetterhoff did not testify at the hearing, *see infra* n.14.  Following the evidentiary hearing, the Court ordered the Government to submit "the full dash and body camera footage from Escambia County Sheriff's Deputies [Fetterhoff and McGhee] related to the events that transpired the afternoon of February 20, 2024 on or around the intersection of W. Hope Drive and Las Vegas Lane in Pensacola, Florida that are the subject of Defendant's pending motion to suppress."  *See* ECF No. 42.  The Government subsequently submitted the requested footage plus bodycam footage from Deputy Corey Smith.  *See* ECF No. 43.

McGhee, who then positioned herself in an adjacent gas station's parking lot to observe the BMW through her rearview mirror.

Sometime later, a gentleman, now known to be Defendant David Denver Holland, exited the gas station, calmly walked past Deputy McGhee's parked patrol vehicle, and entered the Red Roof Inn.  After a few moments, Holland (still unidentified to the deputies) exited the hotel and hopped in the BMW.  He pulled out of the Red Roof Inn parking lot and turned onto Wilde Lake Boulevard heading towards I-10, where he stopped at the red light just before the interstate's onramp. Two cars back, Deputy Fetterhoff began tailing him, so also stopped at the same red light.  Deputy McGhee joined immediately behind Deputy Fetterhoff.[3]  Deputy Fetterhoff's dashcam captured the "pursuit" that followed.

At 11:34 a.m., after the light turned green, Holland and the deputies, now three cars behind, accelerated with a half dozen other vehicles merging eastbound onto I-10.   The BMW rounded the onramp bend first and quickly moved into the lefthand lane.  Fifteen seconds later, the deputies made it onto the highway.  Although the lefthand lane was open road, the two deputies, delayed by the slower merging traffic directly in front of them, were already a "fairly long distance" behind the BMW

---

[3] There are no facts in the record demonstrating (or even allowing for the inference) that Holland had any clue the deputies were behind him.

according to Deputy McGhee.  *See* ECF No. 38 at 40:15–21.  This is the last time, based on the dashcam footage, that anything resembling a black BMW can be observed among the dozens of cars on the interstate.



*See* ECF No. 34-3 (showing the view from Deputy Fetterhoff's dashcam before he initiated his lights and sirens and just after two vehicles in the distance shifted lanes leftward and obscured any subsequent view of the BMW).

Over a minute after Deputy Fetterhoff first began tailing the BMW at the red light, he finally activated his lights and sirens as he began traveling up a low-grade hill on the interstate in an attempt to initiate a traffic stop for "the tag attached [to the BMW] not being registered to the vehicle," ECF No. 28-3 at 3–4.  A "pursuit"

of sorts ensued—but don't blink, you might miss it.  After just 23 seconds, Deputy

Fetterhoff cut his lights and sirens just after cresting the hill.  The BMW was still

nowhere in sight.  Deputy McGhee testified at the evidentiary hearing that Deputy

Fetterhoff was "just driving" while his lights and sirens were engaged and that he

made "no genuine effort to get anywhere near [the] black BMW."  *See* ECF No. 38

at 37:14–18.[4]

After giving up the "chase," the deputies split up and searched for the BMW

in the area surrounding the I-10 exit to U.S. Route 29, but to no avail.[5]  The deputies

then returned to the Red Roof Inn and the neighboring gas station to review

surveillance footage and interview staff for leads as to the BMW driver's identity.

Apparently, a front desk clerk at the Red Roof Inn told Deputy Fetterhoff that a man

matching the description provided named "Denver" had just checked out, and the

two were eventually able to deduce Holland's identity from his distinctive neck

---

[4] At the evidentiary hearing, Deputy McGhee testified that, per department policy, neither deputy exceeded the 70 mile per hour speed limit while "pursuing" the BMW.  Although Deputy Fetterhoff's full dashcam footage (submitted after the evidentiary hearing), shows that he traveled in excess of the speed limit, it confirms—more importantly—that he traveled with the flow of traffic while his lights and siren were engaged, barely fast enough to pass the numerous cars ahead of him on the interstate, all while making "no genuine effort to get anywhere near [the] black BMW," ECF No. 38 at 37:14–18.  *See* ECF No. 43.

[5] A subsequent warrant affidavit authored by Deputy Fetterhoff avers that he last observed Holland traveling southbound on U.S. Route 29.  Deputy McGhee testified at the evidentiary hearing that she "[didn't] have any evidence" of that assertion.  *See* ECF No. 38 at 47:19–21.  The dashcam footage from Deputy Fetterhoff's patrol vehicle does not provide any either.

tattoo and Chicago Bulls apparel.  A records check led the deputies to Holland's home on West Hope Drive in Pensacola at approximately 12:55 p.m., an hour and a half after the short "pursuit" on I-10.

Holland's home is a modest, one-story redbrick house located at the corner of West Hope Drive and Las Vegas Lane, a dirt road running parallel to the backyard leading to a group of mobile homes.  The entire property is surrounded by a wooden picket privacy fence, which was actively being repaired by at least two contractors the afternoon the deputies arrived.  There is a gravel driveway on the east side of the front lawn that leads to the main entrance and an enclosed carport.  A gate on Las Vegas Lane allows direct access to the backyard and is large enough to permit vehicles to park there.



*See* ECF No. 34-2 at 2 (showing the front of the residence from West Hope Drive).

According to their body and dash cameras (footage the Court had to request from the Government),[6] Deputies Fetterhoff and McGhee arrived at Holland's home simultaneously.  Deputy Fetterhoff initially pulled his patrol car onto Las Vegas Lane near the backyard gate, and Deputy McGhee parked near the front driveway on West Hope Drive.  Within seconds of their arrival, Deputy McGhee says she observed an unidentified man in a white t-shirt briskly walking along the shallow

---

[6] As noted, the Government initially submitted only Deputy Fetterhoff's dashcam footage from the "pursuit," ECF No. 34-3, which is but a portion of the available dash and body camera footage from the events underlying Holland's motion.  Only at the Court's request did the Government submit the body and dashcam footage capturing the events discussed below.  *See* ECF No. 43.

CASE NO. 3:24-cr-95-MCR

gully parallel to the front driveway. The unidentified man quickly turned into the wooded lot to the east of Holland's property and began trekking through the brush, heading away from the home. Deputy McGhee radioed her observation to Deputy Fetterhoff, who responded by driving his patrol vehicle through the gate and into Holland's fenced backyard.[7] There, Deputy Fetterhoff found the unattended BMW parked within a few feet of Holland's home. The BMW was parked between the enclosed carport, at the time filled with equipment for home improvement projects, and a nearby tool shed. On the other side of the shed was a large black pickup truck, a jon boat, and a trailer.

---

[7] Holland's original motion to suppress included as an exhibit Deputy Fetterhoff's deposition in a related state court prosecution against Holland. *See* ECF No. 24-3. During that deposition, Deputy Fetterhoff testified that he observed an individual standing next to the BMW in the backyard as he arrived, but "upon sight of [law enforcement] the individual fled . . . jumped the fence and ran." *Id.* Nothing in Deputy Fetterhoff's dashcam and bodycam footage corroborates this sworn testimony and it's inconsistent with other statements Deputy Fetterhoff made at the home. In fact, Deputy Fetterhoff tells other law enforcement officers multiple times that he did not see the still-unidentified man in the woods until after Deputy McGhee alerted him. And Deputy McGhee credibly testified that she observed the unidentified man fleeing from the front—not back—side of the home. *See* ECF No. 38 at 18:10–17. Notably, Deputy Fetterhoff did not offer this account at the evidentiary hearing—in fact, as explained *infra* n.14, he didn't testify at all. Nor has the Government argued that Deputy Fetterhoff's account was accurate on this point.



*See* ECF No. 43 (showing the gate to Holland's backyard from Las Vegas Lane).

At 12:56 p.m., Deputy Fetterhoff parked his patrol vehicle several yards behind the tool shed and parallel to a portable firepit within the fenced yard.  He then used his PA system to call out "David Denver Holland, if you are in the woods come back . . . [unintelligible]."  No response.  Deputy Fetterhoff then moseyed up to the BMW and peered in its passenger side windows.  Deputy Fetterhoff reported over the radio that there were "two big bags . . . and some other stuff" in the BMW, and he planned to stay close to the car as a result.

Deputy Fetterhoff subsequently approached the contractors working on repairing the backyard's privacy fence.  He asked the contractors if they had access

to the house (they did not), who they were hired by (they did not know), if they had seen a male with a Chicago Bulls jacket and neck tattoo (they had not), and if the BMW was there when the contractors first arrived (it was not). Deputy Fetterhoff requested that the contractors leave the premises so their scent would not interfere with a K9 pursuit of the unidentified man in the woods.

Around this same time, approximately 1:02 p.m., the deputies' supervisor, Lieutenant Walter Matthews arrived on scene with more backup, including a K9 handler, Deputy Corey Smith, and his trained police dog, Heist. Deputy Fetterhoff relayed the day's events and reiterated that he was "not 100% sure" that the man walking in the woods was Holland. Deputy Smith and Deputy McGhee took off on a "K9 track" with Heist through the woods looking for the unidentified man. Lieutenant Matthews requested search assistance from Florida Highway Patrol airborne assets in the area.

At 1:06 p.m., Deputy Fetterhoff walked around to the front of the house and knocked on the front door. No one was home, so Deputy Fetterhoff turned around and walked through the portion of the privacy fence that was under construction and returned to the backyard. Deputy Fetterhoff began recounting his version of events to Lieutenant Matthews and told him that he noticed two duffle bags in the BMW and asked "how [Lieutenant Matthews] felt about seizing [the BMW]." Lieutenant

CASE NO. 3:24-cr-95-MCR

Matthews responded, "I'm not there yet, but I can be convinced."  Deputy Fetterhoff

cited his earlier pursuit of the BMW and suggested that the BMW could therefore

be seized as a consequence of its use "in the commission of a felony."  Lieutenant

Matthews demurred again, "let me mull it over . . . it is still on private property."[8]

Deputy Fetterhoff began regaling how he had recently executed a "task force hit" on

a mobile home located behind Holland's house—but halfway through he was cut-

off by Lieutenant Matthews, ostensibly using a nonverbal cue.[9]

Moments later, Deputy Fetterhoff walked back to the BMW and again peered

into its windows, presumably searching for evidence of drug trafficking.[10]  This

time, he noticed multiple boxes of sandwich bags.  Deputy Fetterhoff muttered

---

[8] Again, and with disappointment, the Court notes that the Government did not introduce the bodycam footage capturing this exchange between Deputy Fetterhoff and Lieutenant Matthews at the evidentiary hearing.  It was submitted only at the Court's request following the hearing.  *See* ECF Nos. 42, 43.

[9] It is evident, based on the Deputy Fetterhoff's bodycam footage, that the two briefly continued their conversation by whispering (and/or using other nonverbal signals), but the substance of their discussion cannot be discerned from the video.

[10] Because Deputy Fetterhoff did not testify, the Court cannot say for certain that he, subjectively speaking, approached the BMW specifically to look for evidence of drug trafficking. That said, the objective evidence and surrounding circumstances all point in this direction.  The preceding conversation with Lieutenant Matthews centered on the prospect that the BMW harbored narcotics, Deputy Fetterhoff was trying to convince Lieutenant Matthews to seize the vehicle to investigate suspected drug crimes, Lieutenant Matthews shut down the conversation once Deputy Fetterhoff began making speculative statements that could potentially imperil any evidence subsequently uncovered in the BMW, and there was no other reason that Deputy Fetterhoff—20 minutes after first arriving at Holland's home—would have needed to return to the BMW at this point.

CASE NO. 3:24-cr-95-MCR

something in frustration,[11] muted his body camera and began texting on his iPhone, and ultimately retreated to his parked patrol car in the middle of Holland's backyard. At this point, approximately 1:16 p.m., Deputy Fetterhoff turned off his body camera. There is a nearly 50-minute period where Deputy Fetterhoff and Lieutenant Matthews are present in or near Holland's backyard without any dash or body camera recording. Their statements and actions are largely unaccounted for during this nearly hour-long gap.

At 2:05 p.m., the search for the still-unidentified fleeing subject had been called off, and Deputies McGhee and Smith returned to the backyard from their unsuccessful K9 track. Both of their body cameras were still recording. On their return, they found Deputy Fetterhoff and Lieutenant Matthew standing next to Deputy Fetterhoff's patrol car (still parked in Holland's backyard). After a brief, nonverbal exchange with Deputy Fetterhoff, Deputy Smith and his K9 roamed over to the backyard area where the BMW was located. Deputy Smith instructed his K9, "Where's that dope? Find it!" and let him off the leash. The K9 trotted over to the nearby tool shed, entered the enclosed carport briefly, and then circled the BMW, where it alerted to the presence of narcotics.

---

[11] As best the undersigned can tell, Deputy Fetterhoff says either "Ah, damn it . . . there's something in this car," or "Ah, damn it . . . got to get in this car."



*See* ECF No. 43 (bodycam footage from Deputy Smith prior to conducting the drug dog sniff of the BMW).

As K9 Heist was sniffing for drugs, Deputy Fetterhoff updated the newly returned Deputy McGhee that there are a "bunch of sandwich bags" in the backseat and "two book bags." He informed Deputy McGhee that the plan was to tow the BMW from the backyard and submit a warrant application to search it later.

Following the positive alert, Deputy McGhee went to see the BMW for herself and remarked "damn, that's a lot of sandwich bags." Deputy Smith commented that he "sure would like to know" what's in the BMW. And Deputy Fetterhoff stated that he was "still mad . . . [he] did not get [Holland] in the turn lane" before the

interstate.[12]  Lieutenant Matthews assured the group, "it's alright, we got him," and joked that Deputy Fetterhoff "will look good in [the BMW] in the parade."

Later that afternoon, the BMW was seized and towed out of Holland's backyard without a warrant.  At approximately 4:00 p.m., Deputy Fetterhoff submitted an affidavit requesting a warrant for Holland's arrest for (i) operating a motor vehicle without a license under Fla. Stat. § 322.03(1); and (ii) fleeing and eluding under Fla. Stat. § 316.1935(2).  *See* ECF No. 28-3.  A day later, on February 21, 2024, a Florida state court judge signed a warrant for Holland's arrest—solely for fleeing and eluding under Fla. Stat. § 316.1935(2).  *Id.*

Nearly a week later, on February 28, 2024, Deputy Fetterhoff submitted an affidavit in support of a search warrant application for the BMW.  *See* ECF No. 28-4.  The search warrant was nominally sought to look for evidence of fleeing and eluding, but the affidavit notes the positive K9 alert for narcotics, the boxes of plastic sandwich bags, and, for the first time, that multiple cell phones could be seen in the driver's side door.  *Id.*  Deputy Fetterhoff described his "pursuit" of the BMW in the following manner:

---

[12] Recall that Deputy Fetterhoff sat two cars behind the BMW for approximately 30 seconds at the red light on Wilde Lake Boulevard before proceeding to the interstate and did not initiate his lights and sirens until over a minute after he first began tailing the BMW at the red light.  By that point, though, the BMW was nowhere to be seen.

> As [Holland] exited the hotel parking lot he began to travel East Bound on the interstate from the Pine Forest exit at which time your affiant observed [Holland] immediately began [sic] operating the vehicle in an excess of 100mph and begin conducting excessive lane changes in an attempt to create distance from himself and law enforcement. Your affiant activated the emergency equipment (lights and sirens) in an attempt to conduct a traffic stop on the black BMW for the tag attached not being registered to the vehicle. [Holland] failed to stop at which time your affiant deactivated the emergency equipment and terminated the traffic stop.

*See id.* at 2–3.[13] A search warrant was issued and executed the same day. *Id.* at 6–7. The search of the BMW uncovered drug paraphernalia, a nine-millimeter pistol, ammunition, and a safe located in the trunk containing methamphetamine, fentanyl, cocaine, and around $14,000 cash. *See* ECF No. 28 at 5. On February 29, 2024, another arrest warrant for Holland was issued based on the drugs, gun, and ammunition found in the BMW. *See* ECF No. 28-5.

On March 14, 2024, Deputy Fetterhoff and other members of a U.S. Marshals Task Force arrested Holland around a trailer park near West Hope Drive. Holland was carrying a small shoulder bag at the time of his arrest containing more methamphetamine and cocaine, heroin, and a little over $5,000 cash to boot.

---

[13] Deputy Fetterhoff's description of the "pursuit" is the same, in all material respects, across each of the three warrant affidavits he authored in this matter. *See* ECF Nos. 28-3–28-5.

CASE NO. 3:24-cr-95-MCR

On October 15, 2024, Holland was indicted on federal charges based on the evidence obtained through the search of the BMW and as a result of his arrest. Holland has moved to exclude this evidence from his trial. *See* ECF Nos. 24, 33. The Government, predictably, opposes. *See* ECF No. 28. On February 6, 2025, the Court held an evidentiary hearing on Holland's motion. Deputy McGhee, Lieutenant Matthews, and Holland each testified and were subject to cross examination.[14] Each side, at the invitation of the Court, submitted their closing arguments in writing. *See* ECF Nos. 39, 40.

## II.    Discussion

The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. To give those words effect, over a century ago the Supreme Court established the exclusionary rule, *Weeks v. United States*, 232 U.S. 383, 398

---

[14] Surprisingly, Deputy Fetterhoff, the key law enforcement officer in this case, did not testify at the evidentiary hearing—even after the Court continued the hearing to allow the Government to call him. *See* ECF No. 35 (withdrawing the Government's motion for a continuance and moving to close the hearing). At the hearing, the Government represented that Deputy Fetterhoff would not testify because he had a conflicting medical appointment, ECF No. 38 at 3:20–4:9. Given Deputy Fetterhoff's crucial role in this story, the Court heard the other evidence and then continued the hearing so that the Government could present Deputy Fetterhoff's testimony at a more convenient time. However, the Government ultimately decided that Deputy Fetterhoff's testimony would not "benefit the Court sufficiently to warrant the [further] continuance." *See* ECF No. 35 at 1.

(1914), which "prohibits introduction into evidence of tangible materials seized during an unlawful search, and of testimony concerning knowledge acquired during an unlawful search," as well as "derivative evidence . . . acquired as an indirect result of the unlawful search." *Murray v. United States*, 487 U.S. 533, 536–37 (1988) (citations omitted).[15]

## A.   Curtilage

The "chief evil against which" the Fourth Amendment is directed is the government's warrantless physical entry into a person's home. *See Coffin v. Brandau*, 642 F.3d 999, 1009 (11th Cir. 2011) (en banc) (quoting *Payton v. New York*, 445 U.S. 573, 585 (1980)); *see also Silverman v. United States*, 365 U.S. 505, 511 (1961) ("At the very core [of the Fourth Amendment] stands the right of a [person] to retreat into his own home and there be free from unreasonable governmental intrusion."). Indeed, "when it comes to the Fourth Amendment, the home is first among equals." *Florida v. Jardines*, 569 U.S. 1, 6 (2013); *see United States v. McGough*, 412 F.3d 1232, 1236 (11th Cir. 2005) ("Of all the places that can be searched by the police, one's home is the most sacrosanct, and receives the

---

[15] Indirect or derivative evidence of an unconstitutional Fourth Amendment event is excludable "up to the point at which the connection with the unlawful search becomes 'so attenuated as to dissipate the taint.'" *See Murray*, 487 U.S. at 537 (quoting *Nardone v. United States*, 308 U.S. 338, 341 (1939)).

greatest Fourth Amendment protection."). A home's curtilage—the area "immediately surrounding and associated with the home"—is treated as "part of [the] home itself for Fourth Amendment purposes." *Oliver v. United States*, 466 U.S. 170, 180 (1984). The constitutional protections afforded to a home's curtilage have "ancient and durable roots." *See Jardines*, 569 U.S. at 6–7 (citing 4 W. Blackstone, Commentaries on the Laws of England 223, 225 (1769)).

Accordingly, when "a law enforcement officer physically intrudes on . . . curtilage to gather evidence, a search within the meaning of the Fourth Amendment has occurred." *Collins v. Virginia*, 584 U.S. 586, 593 (2018). Such searches are presumptively unreasonable absent a warrant or an applicable exception to the warrant requirement. *See Coolidge v. New Hampshire*, 403 U.S. 443, 474–75 (1971) ("[A] search carried out on a suspect's premises without a warrant is per se unreasonable, unless the police can show that it falls within one of the carefully defined set of exceptions based on the presence of 'exigent circumstances.'" (citations omitted)).

The threshold question raised by Holland's motion, then, is: did the deputies invade the curtilage of Holland's home when they approached the BMW parked in his backyard? Without a doubt, they did and honestly, this is not even a close call, despite the Government's argument that it is. *See* ECF No. 28 at 13.

Courts look to four factors to ascertain whether a particular tract is part of a home's curtilage: (i) "the proximity of the area claimed to be curtilage to the home;" (ii) "whether the area is included within an enclosure surrounding the home;" (iii) "the nature of the uses to which the area is put;" and (iv) "the steps taken by the resident to protect the area from observation by people passing by." *United States v. Dunn*, 480 U.S. 294, 301 (1987). But these factors do not offer a "finely tuned formula that, when mechanically applied, yields a 'correct' answer to all extent-of-curtilage questions." *Id.* Rather, "for most homes, the boundaries of the curtilage will be clearly marked; and the conception defining the curtilage—as the area around the home to which the activity of home life extends—is a familiar one easily understood from our daily experience." *Oliver*, 466 U.S. at 182 n.12.

Under that commonsense approach, the area within the fenced-in backyard where the BMW was parked—just over an arm's-length from the home's brick exterior—is surely part of the home's curtilage. *See United States v. Berrong*, 712 F.2d 1370, 1374 (11th Cir. 1983) (extent of the curtilage in any given case is a question of fact). In fact, the Court finds that Holland's entire backyard is properly considered the curtilage of his home. *Cf. Harris v. O'Hare*, 770 F.3d 224, 240 (2d Cir. 2014), *as amended* (Nov. 24, 2014) ("At the time of the intrusion, it was . . . clearly established that a fenced-in side or backyard directly abutting a single-family

house constitutes curtilage."); *United States v. Romero–Bustamente*, 337 F.3d 1104, 1108 (9th Cir. 2003) (holding that a yard that was "small, enclosed, adjacent to his house, and located behind his house . . . under *Dunn,* as a matter of law . . . falls within the curtilage"); *Daughenbaugh v. City of Tiffin*, 150 F.3d 594, 603 (6th Cir. 1998) ("[T]he law seems relatively unambiguous that a backyard abutting the home constitutes curtilage and receives constitutional protection.").  Holland's backyard is not large, comprising no more than a quarter-acre, and it is clearly demarked as a continuation of the home itself.  The backyard is completely enclosed by an approximately six-foot-high privacy fence, which was actively being repaired when the deputies arrived—an unmistakable expression of Holland's claim to privacy. The backyard and posterior of the home lie within the same fenced-off area.  *See Dunn*, 480 U.S. at 302 ("[I]t is plain that the fence surrounding the residence serves to demark a specific area of land immediately adjacent to the house that is readily identifiable as part and parcel of the house.").  The enclosed carport attached to the east side of the home (and adjacent to the grassy area where the BMW was parked) served as a staging area for common domestic chores like home improvement projects and lawn care.  And there was a bonfire pit between the backyard fence's gate and the BMW, which strongly suggests that the area was used as an intimate gathering place.

No one—certainly no reasonably prudent law enforcement officer—could mistake the backyard for *anything but* curtilage.[16]  The deputies needed to veer off "the path that visitors would naturally take to walk to the front door" to gain access to the backyard.  *United States v. Stephen*, 823 F. App'x 751, 755 (11th Cir. 2020); *see Collins*, 584 U.S. at 593 (finding relevant to the curtilage inquiry that "[a] visitor endeavoring to reach the front door of the house . . . would turn off before entering the [carport]" later found to be curtilage).  In fact, if the backyard's gate had been closed, the deputies would have needed to either climb the fence or step over the contractors actively repairing it to get in.  The police "cannot traipse through the garden, meander into the backyard, or take other circuitous detours that veer from the pathway that a visitor would customarily use."  *Jardines*, 569 U.S. at 19 (Alito, J., dissenting).[17]  The right to be free of an unwarranted search and seizure "would

_____

[16] Notably, Deputy McGhee conceded at the evidentiary hearing that the BMW was parked within the curtilage, ECF No. 38 at 52:24–25, and Lieutenant Matthews expressed contemporaneous concerns with seizing the vehicle without a warrant because it was parked on "private property."  *See* ECF No. 43.

[17] Nor can the police exploit the "implicit license [that] typically permits [a] visitor to approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave," by "introducing a trained police dog to explore the area around the home in hopes of discovering incriminating evidence."  *Jardines*, 569 U.S. at 8–9.  "There is no customary invitation to do *that* . . . .  To find a visitor knocking on the door is routine (even if sometimes unwelcome); to spot that same visitor exploring the front path with a metal detector, or marching his bloodhound into the garden before saying hello and asking permission, would inspire most of us to—well, call the police."  *Id.* at 9.

be of little practical value if the State's agents could stand in a . . . side garden and trawl for evidence with impunity." *Id.* at 6. It is of no consequence (at least for analyzing curtilage questions) that the deputies could lawfully observe the BMW parked in Holland's backyard from Las Vegas Lane through the fence's open gate. Nothing stops them from doing so. *See California v. Ciraolo*, 476 U.S. 207, 213 (1986) ("The Fourth Amendment protection of the home has never been extended to require law enforcement officers to shield their eyes when passing by a home on public thoroughfares."). But the ability to observe from a lawful vantage point what lies on the home's curtilage (or what happens inside of a home) does not itself confer the lawful right to access the home or its curtilage. *See Collins*, 584 U.S. at 600; *Coolidge*, 403 U.S. at 468 ("[P]lain view alone is never enough to justify the warrantless seizure of evidence . . . . [It] may establish the fullest possible measure of probable cause. But even where the object is contraband, this Court has repeatedly stated and enforced the basic rule that the police may not enter and make a warrantless seizure.").[18]

---

[18] The Government has not argued the "plain view" doctrine. *See Horton v. California,* 496 U.S. 128, 136–37 (1990) (holding that before police may seize an item pursuant to the plain view doctrine: (i) the item must be in plain view; (ii) the item's incriminating nature must be immediately apparent; (iii) the item must be viewed by an officer lawfully located in a place from which the object can be seen; and (iv) the item must be seized by an officer who has a lawful right of access to the object itself).

### B.    The Warrant Requirement and Exceptions Thereto

So, was the deputies' entry onto Holland's curtilage lawful, *i.e.*, supported by a warrant or justified under one of the "jealously and carefully drawn" exceptions to the warrant requirement?  *Georgia v. Randolph*, 547 U.S. 103, 109 (2006) (citation omitted).  Nope.  Deputy Fetterhoff did not possess a warrant when he drove his patrol car into Holland's backyard.  Nor were the deputies faced with a "now or never situation" where it would have been impracticable or impossible to secure a warrant before entering the backyard.  *See Riley v. California*, 573 U.S. 373, 391 (2014) (internal marks omitted).

The *only* exigency argument tendered by the Government is that Deputy Fetterhoff was temporarily authorized to enter the curtilage to perform a "protective sweep" after Deputy McGhee observed an unidentified man trekking away from the home through the adjacent wooded lot.  A permissible protective sweep "is a quick and limited search of premises . . . conducted to protect the safety of police officers or others," when there are "articulable facts which, taken together with the rational inferences from those facts," that "warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene."  *Maryland v. Buie*, 494 U.S. 325, 327, 334 (1990); *see also United States v. Yarbrough*, 961 F.3d 1157, 1166 (11th Cir. 2020) (noting "the thrust of the

protective sweep analysis is objective"); *United States v. Caraballo*, 595 F.3d 1214, 1224–25 (11th Cir. 2010) (approving of a protective sweep that was not incident to an arrest).  Deputy Fetterhoff did nothing of the sort.  With his sidearm holstered, Deputy Fetterhoff sauntered straight to the parked BMW and peered in its windows—not for any protective purpose—but instead presumably to look for evidence of criminality.  The unidentified man was already out of sight in the woods on the other side of the fence and moving away from the home.  None of the deputies have ever averred that they believed anyone at the home or in its vicinity (or in the BMW for that matter) to be armed or otherwise dangerous, including Holland.  And not once did Deputy Fetterhoff so much as peek in the other places—the nearby carport, tool shed, jon boat, and parked truck—in the backyard capable of "harboring other persons who are dangerous and who could unexpectedly launch an attack." *Buie*, 494 U.S. at 333; *see also United States v. Rodgers*, 924 F.2d 219, 222 (11th Cir. 1991) (no valid protective sweep where the officer did not act as though he was conducting one—merely entering the home, seizing the guns in plain view, and stepping outside without making "any inspection of the rest of the premises"). Deputy Fetterhoff's actions show that he never held a subjective fear for his safety at the time of the sweep, and there is no evidence in the record, let alone "specific and articulable facts," *Buie*, 494 U.S. at 337, to suggest that a reasonably prudent

officer would have believed the backyard contained hidden assailants.  *See United States v. Chaves*, 169 F.3d 687, 692 (11th Cir. 1999) (finding a protective sweep not warranted under a totality of the circumstances and noting that "the officers' lack of information cannot justify the warrantless sweep"); *see also United States v. Carter*, 360 F.3d 1235, 1242–43 (10th Cir. 2004) ("[T]here could always be a dangerous person concealed within a structure. But that in itself cannot justify a protective sweep, unless such sweeps are simply to be permitted as a matter of course, a result hardly indicated by the Supreme Court in *Buie*.").[19]  Indeed, it bears repeating that Deputy Fetterhoff never searched for any dangerous persons lying in wait.

---

[19] Tellingly, the Government relies on generalized notions of "officer safety" to try to justify Deputy Fetterhoff's initial sweep. ECF No. 38 at 24:5–11.  That cannot meet its burden of proving an exception to the warrant requirement.  *See Welsh v. Wisconsin*, 466 U.S. 740, 749–50 (1984) ("[T]he police bear a heavy burden when attempting to demonstrate an urgent need that might justify [a] warrantless search[.]").  Officer safety is, of course, a deeply important interest, *see United States v. Gibson*, 64 F.3d 617, 624 (11th Cir. 1995) ("Law enforcement officers are at greatest risk when dealing with potentially armed individuals because they are the first to confront this perilous and unpredictable situation."), but exceptions to the warrant requirement are "jealously and carefully drawn," *Randolph*, 547 U.S. at 109 (citation omitted).  The Supreme Court has made clear that protective sweeps are "decidedly not automatic."  *Buie,* 494 U.S. at 336 (internal marks and citation omitted).  They are authorized only where officers possess "specific and articulable facts showing that another individual, who pose[s] a danger to the officers or others" is hiding in the area to be swept.  *See Chaves*, 169 F.3d at 692.  Unparticularized references to the inherent dangers of policing are not enough.  *See United States v. Colbert*, 76 F.3d 773, 778 (6th Cir. 1996) (finding protective sweep improper because the police did not have an "articulable basis" and observing that "police officers have an incredibly difficult and dangerous task and are placed in life threatening situations on a regular basis. It would perhaps reduce the danger inherent in the job if we allowed the police to do whatever they felt necessary, whenever they needed to do it, in whatever manner required, in every situation in which they must act.  However, there is a Fourth Amendment to the Constitution which necessarily forecloses this possibility.").

*Cf. United States v. Gandia*, 424 F.3d 255, 264 (2d Cir. 2005) ("Officers must point to facts that give rise to an individualized suspicion and cannot rely solely on generalizations that suspects are usually accompanied by dangerous third parties."). He never searched for anyone at all. "This was not merely a situation in which an officer conducted a poor protective sweep and failed to discover a hidden assailant. Rather, it simply was not a protective sweep." *Rodgers*, 924 F.2d at 222.[20]

The Fourth Amendment therefore forbade the deputies from marching onto the curtilage of Holland's home in search of evidence: they had no warrant, there were no exigent circumstances, no one consented to their presence, and no other exception to the warrant requirement applied.

## C.    The Exclusionary Rule

The question now is what, if anything, should be done about it? *See Illinois v. Gates*, 462 U.S. 213, 223 (1983) ("The question whether the exclusionary rule's remedy is appropriate in a particular context has long been regarded as an issue separate from the question whether the Fourth Amendment rights . . . were violated

---

[20] Even assuming the dubious proposition that Deputy Fetterhoff performed a permissible protective sweep, that exigency expired when he returned to his patrol vehicle and reported that he observed "two big bags . . . and some other stuff" in the BMW. None of the items the deputies could see in plain view (including the later-observed boxes of sandwich bags) were "illegal in nature," according to Deputy McGhee. ECF No. 38 at 59:13–25.

by police conduct."). This is where most of the activity is in this case. Holland believes that both the evidence from the search of the BMW and his subsequent arrest should be excluded as the fruit of the unlawful intrusion. The Government urges the Court to refrain from excluding this evidence from Holland's trial, broadly arguing that doing so would not deter future police misconduct.

"Ever since its inception," the exclusionary rule "has been recognized as a principal mode of discouraging lawless police conduct." *Terry v. Ohio*, 392 U.S. 1, 12 (1968). The rule endeavors to "compel respect for the" Fourth Amendment "by removing the incentive to disregard it." *Elkins v. United States*, 364 U.S. 206, 217 (1960). Fundamentally, the rule rests "on the judgment that the importance of deterring police conduct that may invade the constitutional rights of individuals throughout the community outweighs the importance of securing the conviction of the specific defendant on trial." *United States v. Caceres*, 440 U.S. 741, 754 (1979); *see also Brinegar v. United States*, 338 U.S. 160, 180–81 (1949) (Jackson, J., dissenting) ("Uncontrolled search and seizure is one of the first and most effective weapons in the arsenal of every arbitrary government . . . . Courts can protect the innocent against such invasions indirectly and through the medium of excluding evidence obtained against those who frequently are guilty.").

But "[d]espite its broad deterrence purpose, the exclusionary rule has never been interpreted to proscribe the use of illegally seized evidence in all proceedings or against all persons." *United States v. Calandra*, 414 U.S. 338, 348 (1974). Given the high societal costs involved in potentially letting the guilty go free, the Supreme Court instructs that excluding evidence should "always . . . [be a] last resort, not [a] first impulse." *Hudson v. Michigan,* 547 U.S. 586, 591 (2006). Over time, the Supreme Court has accordingly articulated "important principles," exceptions, really, "that constrain application of the exclusionary rule." *Herring v. United States*, 555 U.S. 135, 140 (2009). The Government invokes just about every recognized exception here. But not even the kitchen sink can salvage the Government's case.

### 1.    Warrant to Search the Vehicle

Let's begin with the Government's argument that the independent source doctrine defeats the application of the exclusionary rule as to the evidence found in the BMW. Under this exception, "evidence initially discovered during, or as a consequence of, an unlawful search" may nevertheless be introduced where that same evidence is "later obtained independently from activities untainted by the initial illegality." *Murray*, 487 U.S. at 537. This is so the Government is placed in "the same, not a worse, position" than it would otherwise be in but-for the police

misconduct.  *Nix v. Williams*, 467 U.S. 431, 443 (1984) (emphasis omitted).  The independent source doctrine is commonly raised when the police apply for and obtain a warrant after conducting an unlawful search and seizure.  *See, e.g.*, *United States v. Maxi*, 886 F.3d 1318, 1330 (11th Cir. 2018).

Yet, for "a later, lawful [search to be] genuinely independent of an earlier, tainted one," *Murray*, 487 U.S. at 542, the Government must carry the "much more onerous burden" (vis-à-vis the burden to procure a warrant in the first place) of demonstrating that information gleaned during the unlawful entry did not "affect[] either the law enforcement officers' decision to seek a warrant or the magistrate's decision to grant it."  *Id*. at 540.  It is "difficult to establish" genuine independence when "the [unlawfully] seized [evidence is] kept in the police's possession" until a warrant is secured.  *Id.* at 542.

In *United States v. Noriega*, the Eleventh Circuit articulated a "two-part test" to determine whether the independent source doctrine applies when "a government agent makes an initial warrantless entry that arguably violates the Fourth Amendment and then relies in part on what he saw during that entry to obtain a search warrant."  676 F.3d 1252, 1260 (11th Cir. 2012).  First, the Court "excise[s] from the search warrant affidavit any information gained during the arguably illegal initial entry and determine[s] whether the remaining information is enough to

support a probable cause finding." *Id*. (internal citations omitted).  Second, if the remaining information is sufficient to support a finding of probable cause, the Court "determine[s] whether the officer's decision to seek the warrant was 'prompted by' what he had seen during the arguably illegal entry." *Id*. (internal citations omitted). Put differently, in the latter inquiry, "courts ask whether the officer would have sought the warrant even if he had not entered." *Id*. at 1260–61.

The independent source doctrine is not at play here.  The heart of the Government's argument is that the deputies had lawfully obtained probable cause based on fleeing and eluding to search the BMW before they ever set foot in Holland's backyard.  According to the Government, the search warrant for the BMW is therefore a lawful, independent method by which law enforcement discovered the evidence in the car.  The Government's independent source argument fails at the threshold and under the terms of the *Noriega* test.

It is doomed at the threshold because the Government points to no warrant or other independent right of access justifying the deputies' entry onto Holland's curtilage.  A warrant to search a car at an impound lot does nothing to cure the unlawful trespass onto Holland's curtilage.  *See Collins*, 584 U.S. at 596 ("[S]earching a vehicle parked in the curtilage involves not only the invasion of the Fourth Amendment interest in the vehicle but also an invasion of the sanctity of the

curtilage."); *cf. Horton*, 496 U.S. at 136–37 (holding that "any valid warrantless seizure of incriminating evidence" in plain view still requires that the officer "have a lawful right of access to the object itself"). The subsequently issued search warrant for the BMW cannot bless the "intrusion on [Holland's] *separate and substantial* Fourth Amendment interest in his home and curtilage." *Collins*, 584 U.S. at 596 (emphasis added). This logical mismatch alone is fatal to the Government's independent source argument.

Nevertheless, the Government's argument likewise collapses under the *Noriega* test.[21] Even assuming for argument's sake that the Government satisfies

---

[21] The Court notes that there appears to be some disconnect between the test that the Eleventh Circuit laid out in *Noriega* and the Supreme Court's seminal independent source doctrine opinion, *Murray*. In *Murray*, law enforcement observed two vehicles leave a warehouse suspected of housing narcotics. 487 U.S. at 535. Law enforcement lawfully stopped and seized the vehicles and discovered marijuana. *Id.* After learning about the marijuana seizures, several of the officers unlawfully forced their way into the unoccupied warehouse and observed bales in plain view that they thought contained marijuana. *Id.* The officers left without disturbing anything and then applied for a warrant to search the warehouse—making no mention of the unlawful sneak peek (*i.e.*, the entry or of the discovery of the bales of marijuana). *Id.* at 535–36. Because the magistrate judge's decision to issue the warrant was unaffected by the unlawful entry (of which the magistrate judge was unaware), the Supreme Court held that the independent source doctrine would apply if, on remand, the district court found that the officers' decision to seek the warrant was not affected by having "earlier entered the warehouse." *Id.* at 543. In other words, as noted above, the two conditions precedent to the independent source doctrine's application are that the information learned during the illegal search must not have (i) "prompted" the "decision to seek the warrant," or (ii) "affected [the magistrate judge's] decision to issue the warrant." *Id.* at 542. The *Noriega* test, however, by simply instructing that the unlawfully obtained information be "excised," 676 F.3d at 1260, appears to give short shrift to the Supreme Court's instruction that the independent source doctrine applies *only when the illegal search did not sway the magistrate judge's decision to subsequently grant the warrant application. Murray*, 487 U.S. at 542 n.3 ("[W]hat counts is whether the actual illegal search had *any effect* in producing the warrant . . . .") (emphasis added).

part one of the *Noriega* test,[22] the Government cannot prevail on part two because the record demonstrates that the decision to seek a search warrant in this instance was prompted only by what the deputies observed during the illegal entry.  It is painfully clear that the deputies had no intention of procuring a warrant to seize or search the BMW until Deputy Fetterhoff invaded Holland's curtilage.  In fact, even after Deputy Fetterhoff drove his patrol vehicle into Holland's backyard, noticed the "two big bags . . . and some other stuff" in the BMW, and began to suspect that the BMW harbored narcotics (based in part on the surrounding neighborhood), his supervisor, Lieutenant Matthews, was still not convinced they had enough to seize and search the BMW based on the earlier "pursuit."  It was only later, following Deputy Fetterhoff's second inspection of the BMW (when he saw multiple boxes of sandwich bags), that Lieutenant Matthews finally agreed to seize the BMW on the condition that Deputy Fetterhoff would later apply for a search warrant for the car.  And even then, they still had Deputy Smith run his K9 around the BMW to sniff for

---

After all, information obtained from an illegal search, although later excised, is still presented to an issuing magistrate judge (unlike in *Murray* where the magistrate judge was none the wiser). This Court, of course, is bound to follow the Eleventh Circuit's interpretation of *Murray*—and, at any rate, the independent source doctrine is inapplicable to the facts presented here for the other weighty reasons discussed above.

[22] Below, the Court ultimately concludes that the deputies lacked probable cause to believe Holland violated Fla. Stat. § 316.1935(2).  *See infra* Section II(c)(2).

CASE NO. 3:24-cr-95-MCR

drugs after returning from the search for the unidentified man. The record plainly reflects that the deputies' decision to seek the search warrant for the BMW was prompted by what they observed parading through Holland's curtilage. The only evidence on the other side of the ledger is Deputy McGhee's and Lieutenant Matthews' unadorned testimony that, if any of the deputies realized that the BMW was parked on Holland's curtilage, they would have sought a search warrant based on Holland's supposed failure to pull over after Deputy Fetterhoff attempted to initiate a traffic stop for "the tag attached [to the BMW] not being registered to the vehicle," ECF No. 28-3 at 3–4. *See* ECF No. 38 at 26:22–27:2, 72:12–21. But this sort of Monday morning quarterbacking is particularly unavailing here, where Lieutenant Matthews contemporaneously expressed concerns that the BMW was "on private property" *before* deciding to seize the vehicle without a warrant anyway and Deputy McGhee admitted at the evidentiary hearing that the BMW was parked within the curtilage. *See United States v. Flores*, 888 F.3d 537, 546 (1st Cir. 2018) (courts are not bound by "after-the-fact assurances" by officers averring they intended to seek a warrant all along).[23]

---

[23] Although the Court found Deputy McGhee's testimony credible in many respects, her testimony on this score was not. On the other hand, Lieutenant Matthews' testimony was questionable in several respects, including, albeit not limited to, his testimony that the curtilage issue never crossed his mind because he thought Holland's home was "abandoned" as it was in a "horrible state of affairs," when at the scene he acknowledged and expressed concern that the

The Court cannot accept the Government's independent source argument under these circumstances. Doing so would eviscerate the exclusionary rule—and threaten to swallow the entire warrant requirement. Indeed, if the Fourth Amendment's protection of "[t]he right of people to be secure in their . . . houses" has any real meaning, the Court must exclude the evidence that the deputies found in the BMW seized from Holland's curtilage. U.S. Const. amend. IV.[24]

### 2.    Arrest Warrants

The facts presented by this case also cut decisively in favor of excluding the evidence obtained when Holland was arrested. Recall that the first arrest warrant was issued for fleeing and eluding under Fla. Stat. § 316.1935(2), and the second warrant was based on contraband found in the search of the BMW. Section

---

BMW was parked on private property. *See* ECF No. 38 at 72:4–11. That inconsistency aside, Holland's home could not be mistaken for abandoned. Countless homes in Pensacola are identically situated, including many in Holland's neighborhood. Moreover, Lieutenant Matthews played possum when asked to simply identify Deputy Fetterhoff's patrol vehicle, *id.* at 75:6–14, and suggested that the BMW was parked an astounding 20 feet—the length of two basketball hoops—from Holland's home, *id.* at 76:4.

[24] To save the evidence uncovered from the vehicle search, the Government principally relies on the independent source doctrine, but the Government also challenged Holland's Fourth Amendment standing in the BMW prior to the evidentiary hearing. *See* ECF No. 28. In its written closing statement after the hearing, however, the Government did not press this argument following Holland's testimony. *See* ECF No. 40. That was wise. Holland's undisputed testimony established that he had permission to use the BMW on the day in question. *See* ECF No. 38 at 81; *cf. United States v. Cohen*, 38 F.4th 1364, 1369 (11th Cir. 2022) ("For [Fourth Amendment] standing purposes, it is typically enough that the driver is operating a vehicle with the permission of the owner." (internal citation and marks omitted)).

316.1935(2) makes it a felony for a person to "willfully flee[] or attempt[] to elude a law enforcement officer" in a patrol vehicle that has its "siren and lights activated." In short, "the focus is on whether law enforcement's lights and sirens were activated and whether the defendant knew he or she was being ordered to stop by law enforcement and whether the person chose to defy that order by failing to stop." *Ward v. State*, 59 So.3d 1220, 1223 (Fla. 4th DCA 2011). The Government contends that, at a minimum, the drugs and cash recovered during Holland's arrest should not be suppressed because (i) Deputy Fetterhoff and the other arresting officers relied in good faith on warrants issued by neutral and detached magistrate judges; (ii) regardless of any constitutional violation related to Holland's home, the deputies inevitably would have discovered this evidence through lawful methods by virtue of their investigation into the BMW's highway flight; and, relatedly, (iii) Deputy Fetterhoff did not need a warrant to effectuate Holland's arrest since it was done in public and he had probable cause to believe Holland violated Fla. Stat. § 316.1935(2), *see United States v. Watson*, 423 U.S. 411 (1976) (holding that a warrantless arrest of an individual in a public place upon probable cause does not violate the Fourth Amendment). Each argument fails.

The good-faith exception announced in *United States v. Leon,* 468 U.S. 897 (1984), is not a lifeline for the Government here. Under *Leon*, evidence should not

be suppressed when police act "in objectively reasonable reliance" on a subsequently invalidated warrant. *Id.* at 922. The idea is that the "exclusionary rule was crafted to curb police rather than judicial misconduct," *Herring*, 555 U.S. at 142, and "[p]enalizing the officer for the magistrate's error, rather than his own, cannot logically contribute to the deterrence of Fourth Amendment violations," *Leon*, 468 U.S. at 921. But the Eleventh Circuit has held that the *Leon* good-faith exception does not apply when the police present tainted evidence in support of a warrant application. *See McGough*, 412 F.3d at 1239–40.[25] In Holland's arrest warrant issued for fleeing and eluding, Deputy Fetterhoff specifically noted the positive K9 alert for narcotics on the BMW—which was performed in contravention of Holland's Fourth Amendment rights. *See* ECF No. 28-3. And Holland's second arrest warrant issued for a myriad of drug crimes was premised entirely on evidence the Court has found should be suppressed. *See* ECF No. 28-5.

If that weren't reason enough to conclude that the *Leon* good-faith exception is ill-suited to the facts of this case, the warrant application submitted by Deputy

---

[25] The Eleventh Circuit's rule on this issue is in conflict with many of its sister circuits. *See United States v. Bain*, 874 F.3d 1, 21 (1st Cir. 2017) (disagreeing with *McGough* and collecting cases). The Eleventh Circuit's rule, though, is a good one. The task of a magistrate judge reviewing a warrant application is to determine "whether a particular affidavit establishes probable cause," *Leon*, 468 U.S. at 914, not whether the underlying information was obtained in accord with the Fourth Amendment. *See also* 1 Wayne R. LaFave, Search and Seizure § 1.3(f) (5th ed. 2015) (a magistrate judge does "not endorse past activity; he only authorize[s] future activity").

Fetterhoff regarding his "pursuit" of the BMW was misleading.  Reading his warrant

affidavit, one might think Deputy Fetterhoff lifted his factual account from a Fast

and Furious movie when it in fact bears almost no resemblance to the video footage

captured by his squad car's dashcam.  The affidavit stated that Holland exited the

Red Roof parking lot and began traveling eastbound on I-10 where the BMW

"immediately began operating the vehicle in excess of 100 mph and beg[an]

conducting excessive lane changes in an attempt to create distance [with] law

enforcement."  *See* ECF No. 28-3.  Pause here; already, the affidavit failed to

mention that (i) Deputy Fetterhoff sat at a red light behind Holland for up to 30

seconds before proceeding to the interstate;[26] (ii) two cars separated Holland and the

deputies at the red light, making it much less likely that Holland knew law

enforcement was behind him;[27] and (iii) Deputy Fetterhoff was delayed by slower

---

[26] Deputy Fetterhoff imbued his warrant affidavit with the impression that the BMW peeled out of the Red Roof Inn parking lot and immediately sped onto the interstate to avoid law enforcement.  This characterization is flatly inconsistent with Deputy Fetterhoff's dashcam footage.

[27] There is no objective record evidence from which a reasonable officer in Deputy Fetterhoff's shoes could conclude (nor could a factfinder infer) that Holland knew the deputies were tailing him.  Holland testified at the evidentiary hearing that he did not know law enforcement was behind him when he left the Red Roof Inn or when he was on the interstate.  *See* ECF No. 38 at 84:14–19, 90:19–21.  And Deputy McGhee acknowledged that, in her experience, drivers commonly "have no idea that law enforcement just happens to be behind them" before they are stopped, *id.* at 34:1–13, and, worse yet, "nothing resembl[ing] a black BMW" could be seen in Deputy Fetterhoff's dashcam footage at the time he engaged his emergency equipment, *id.* at 35:5–18.

moving traffic, causing him to be, in Deputy McGhee's words, a "fairly long distance" behind Holland before his patrol vehicle even hit the interstate. *See* ECF No. 38 at 40:15–21.[28]  Moreover, the dashcam footage does not support Deputy Fetterhoff's depiction that the BMW was swerving "excessively" in and out of traffic (or at all) to avoid law enforcement.  Returning to the affidavit, which ultimately charges that Holland "failed to stop" after Deputy Fetterhoff activated his lights and sirens, once again reveals critical omissions that mislead the reader.  In particular, (i) Deputy Fetterhoff's lights and sirens were activated, charitably, for only 23 seconds; (ii) the interstate was busy, and Holland's BMW was just one of the many—at least a dozen—cars in front of Deputy Fetterhoff; (iii) Deputy Fetterhoff activated his emergency equipment at the base of a low-grade hill, meaning that any car that had already crested the hill (including, all but certain, the BMW) never saw Deputy Fetterhoff's lights; and (iv) Deputy Fetterhoff, in his duty partner's own words, made "no genuine effort to get anywhere near [the] black BMW," *see id.* at 37:14–18.[29]

---

[28] Deputy Fetterhoff decided not to initiate his lights and sirens at the red light and later lamented that he was "still mad . . . [he] did not get [Holland] in the turn lane" before the interstate. *See* ECF No. 43.

[29] The Government has repeatedly argued that the dashcam footage is grainy and cannot fully incapsulate the deputies' real-time, naked-eye observations.  However, the Court has found the dash and body cameras' remarkably high-resolution footage clear.  So clear, in fact, that the Court can readily observe that none of vehicles separating Deputy Fetterhoff and the BMW on the

The good-faith exception does not automatically apply whenever law enforcement obtains a warrant.  The warrant process is *ex parte* and accepts as a given that the police are operating in good faith.  *See Franks v. Delaware*, 438 U.S. 154, 164 (1978) ("[T]he Warrant Clause . . . surely takes the affiant's good faith as its premise . . . .").  When the police present a judge with the full and accurate picture and a warrant is issued on that basis, suppression is rarely, if ever, appropriate because police are entitled to presume the judge made the right call.  *See Messerschmidt v. Millender*, 565 U.S. 535, 547–48 (2012).  But when police withhold or obscure unfavorable information, the law does not extend the same courtesy.  *See United States v. Martin*, 297 F.3d 1308, 1320 (11th Cir. 2002); *see also Franks*, 438 U.S. at 169 ("The magistrate has no acquaintance with the information that may contradict the good faith and reasonable basis of the affiant's allegations.").  If the police know of a problem with a warrant application, the law requires them to be forthcoming about it.  *See Leon*, 468 U.S. at 914–15 (courts should not defer to a warrant when the magistrate's determination was based on a "knowing or reckless falsity" or when the magistrate was not presented with "[s]ufficient information").  Deputy Fetterhoff did the opposite.  *See Martin*, 297

---

interstate slowed or pulled over for the brief period Deputy Fetterhoff's emergency equipment was on.

F.3d at 1320 ("The exclusionary rule is meant to guard against police officers who purposely leave critical facts out of search warrant affidavits because these facts would not support a finding of probable cause.").  The *Leon* good-faith exception is accordingly no refuge for the Government.

The Government rightly acknowledges that its two remaining arguments to duck suppression—that the inevitable discovery doctrine applies and that warrantless public arrests are constitutional—turn on the existence of probable cause that Holland fled and eluded Deputies Fetterhoff and McGhee.  *See* ECF 40 at 13.[30] No matter how low of a bar probable cause is, a reasonably prudent officer would not have believed that Holland violated Fla. Stat. § 316.1935(2).  *See Williamson v. Mills*, 65 F.3d 155, 158 (11th Cir. 1995) (probable cause for an arrest exists where "the facts and circumstances within the officer's knowledge, of which he or she has reasonably trustworthy information, would cause a prudent person to believe, under the circumstances shown, that the suspect has committed, is committing, or is about

---

[30] The inevitable discovery doctrine is a close cousin to the independent source doctrine. While the independent source doctrine asks whether police *actually acquired* evidence from a lawful, independent source, the inevitable discovery doctrine asks whether the Government can show, by a preponderance of the evidence, that the illegally obtained evidence *would have* inevitably been discovered from a lawful, independent source.  *See United States v. Watkins*, 10 F.4th 1179, 1181 (11th Cir. 2021); *see also Nix*, 467 U.S. at 443 n.4 ("The ultimate or inevitable discovery exception to the exclusionary rule is closely related in purpose to the harmless-error rule . . . .").

to commit an offense").[31]  This Court has previously noted the breadth of Florida's
fleeing and eluding statutes: "[n]either the speed at which a driver flees nor the
distance he travels before finally stopping is determinative of whether probable
cause exists for the crime of fleeing or attempting to elude."  *United States v.
Garrette*, 2017 WL 3337258, at *4 (N.D. Fla. Aug. 4, 2017), *aff'd*, 745 F. App'x
124 (11th Cir. 2018).  As has the Eleventh Circuit.  *See Manners v. Cannella*, 891
F.3d 959, 971–72 (11th Cir. 2018) (opining that probable cause could exist even if
the petitioner had merely slowed in response to a police signal or if he had failed to
promptly pull over in order to reach a well-lit gas station at night).  When a broad

---

[31] The Government has never argued that the deputies, prior to arriving at Holland's home,
possessed probable cause to arrest Holland on any charge other than for violating Fla. Stat.
§ 316.1935(2).  The Government did not argue, for example, that probable cause existed to arrest
Holland for speeding or any other traffic infraction.  Our adversarial system "follow[s] the
principle of party presentation," *United States v. Sineneng-Smith*, 590 U.S. 371, 375 (2020), and
the Court will not speculate as to whether any other investigative avenues would have inevitably
led to Holland's arrest.  It's the Government's burden to articulate these avenues—and that burden
must be met by a preponderance of the evidence.  *See Watkins*, 10 F.4th at 1211 ("Absolute
certainty is not required, only a showing that it is more likely than not the evidence would have
been discovered without the violation.").  Besides, the question under the inevitable discovery
doctrine is not simply whether the deputies had probable cause to arrest Holland and conduct a
search incident to arrest.  The Government must show that the arrest *would* have happened, not
just that it *could* have happened.  *See Nix*, 467 U.S. 431, 444–45 n.5 ("[I]nevitable discovery
involves no speculative elements."); *see also United States v. Heath*, 455 F.3d 52, 58 (2d Cir.
2006) (vacating and remanding district court's finding that the inevitable discovery doctrine
applied because "[e]ven if . . . a reasonable police officer *could have* made a valid arrest supported
by probable cause, it does not establish with a sufficiently high degree of certainty that a reasonable
police officer *would have* made the arrest under the circumstances").  After all, the Government
needs to sufficiently demonstrate that the discovery of the evidence was "inevitable."  And here,
there is no record evidence demonstrating that the deputies would have arrested Holland at a later
point based on traffic violations he may or may not have committed.

criminal statute and probable cause tango in a motion to suppress, the defendant rarely comes out on top. Holland does here. Even after activating his lights and sirens, Deputy Fetterhoff was "just driving." *See* ECF No. 38 at 37:14–18.[32] Indeed, Deputy Fetterhoff made "no genuine effort to get anywhere near [the] black BMW" to alert Holland that he was being ordered to stop—even though up to a dozen vehicles separated Deputy Fetterhoff and Holland, none of which stopped or even slowed or pulled over, and the BMW that Holland was driving was so far in the distance that it cannot be made out on Deputy Fetterhoff's dashcam footage. *Id.*



---

[32] The fact that Deputy Fetterhoff drove in excess of I-10's speed limit while his lights and sirens were engaged is of limited relevance. It makes it no more likely that Holland knew he was being ordered to stop or that a reasonably prudent officer would have believed Holland knew as much. Deputy Fetterhoff was nowhere near the BMW while his lights and sirens were engaged.

*See* ECF No. 43 (showing the view from Deputy Fetterhoff's dashcam the moment he activated his lights and sirens).[33]  How could a reasonably prudent officer believe that Holland defied an order Deputy Fetterhoff made no genuine effort to give?  And what reasonably prudent officer would believe that Holland knew that Deputy Fetterhoff was trying to stop him, as opposed to one of the numerous other vehicles between them, not one of which pulled over?[34]  The 23-second length of the "pursuit" magnifies these flaws.  Deputy Fetterhoff's short-lived show of authority makes it improbable that any driver in front of him—including Holland—knew that they were being directed to stop.[35]  Considering the totality of the circumstances,

---

[33] As noted above, based on the dashcam footage, it is quite likely that the BMW had crested the low-grade hill by this point.  In fact, at the time Deputy Fetterhoff activated his emergency equipment, Deputy McGhee concedes that "nothing resembl[ing] a black BMW" can be observed on the video. ECF No. 38 at 35:5–18.  Nor could she identify what lane the BMW was traveling in or how many times it had switched lanes before Deputy Fetterhoff engaged his lights and siren. *Id.* at 42:15–20.

[34] Further, no reasonably prudent officer would believe that probable cause existed to arrest each and every driver—again, up to a dozen—who failed to stop while Deputy Fetterhoff's emergency equipment was activated.

[35] This stands in stark contrast to situations where it is reasonable to conclude that drivers *knew* they were being ordered to pull over.  In those cases, Florida courts routinely hold that the length of time a driver proceeds before stopping is largely irrelevant to determining whether probable cause for fleeing and eluding existed.  *Cf. State v. Kirer*, 120 So.3d 60 (Fla. 4th DCA 2013) (holding that deputy had probable cause to stop defendant for fleeing or attempting to elude where, in response to lights and sirens, defendant pulled out of driveway, drove 10 miles per hour for five minutes, made five turns, and eventually stopped when law enforcement blocked his way); *Henderson v. State*, 88 So.3d 1060 (Fla. 1st DCA 2012) (affirming denial of motion to suppress where defendant responded to lights and sirens by "slow[ing], as if to pull off on the grass shoulder, but then continu[ing] to drive for one to two miles" without speeding or violating any traffic laws").

including those that preceded the deputies' "pursuit" of Holland,[36] the Court cannot find that a reasonable and prudent officer would believe Holland fled and attempted to elude the deputies once the lights and siren were activated.

The Court will therefore suppress the evidence obtained during Holland's arrest. The arrest warrants were tainted by evidence obtained unconstitutionally, Deputy Fetterhoff omitted critical facts from the warrant application to mask the fact that there was no probable cause to believe Holland violated Fla. Stat. § 316.1935(2), and the Government has not demonstrated that any other exception to the exclusionary rule applies.

## III.    Conclusion

Today's decision confirms the obvious: absent a warrant or applicable exception, the police cannot drive a squad car into your backyard, march a drug dog through the curtilage of your home, and seize your car if the dog alerts. Nor can the police cure that Fourth Amendment violation by later seeking search and arrest warrants on charges for which there is no probable cause to begin with. The

---

[36] At times, the Government has implied that Deputy Fetterhoff's belief that Holland violated Fla. Stat. § 316.1935(2) is somehow bolstered by the fact that he thought he was pursuing the registered owner of the BMW, who had an outstanding felony arrest warrant. The Government's position is a stretch, to put it mildly. The BMW's registered owner, a women named Catherine Smith, obviously was not the man with a distinctive neck tattoo (later understood to be Holland) the deputies observed enter the BMW before leaving the Red Roof Inn.

Supreme Court instructs that "[p]olice practices trigger the harsh sanction of exclusion only when they are deliberate enough to yield 'meaningfu[l]' deterrence, and culpable enough to be 'worth the price paid by the justice system.'"  *Davis v. United States*, 564 U.S. 229, 240 (2011) (alteration in original) (quoting *Herring*, 555 U.S. at 144).  The exclusionary rule pays its way here.  The deputies' conduct exhibited a deliberate, reckless, and grossly negligent disregard for the Fourth Amendment.  *See Davis*, 564 U.S. at 238.  Suppression of both the evidence discovered through the search of the BMW and Holland's arrest is the only remedy. Our "society must swallow this bitter pill," in the present case and unfortunately "ignore reliable, trustworthy evidence" of the crimes for which Holland is accused. *Id.* at 237.  "But there is nothing new in the realization that the Constitution sometimes insulates the criminality of a few in order to protect the privacy of us all." *Arizona v. Hicks*, 480 U.S. 321, 329 (1987).

Accordingly, Holland's motion to suppress, ECF No. 33, is **GRANTED**.

**DONE AND ORDERED** this 30th day of May 2025.

*M. Casey Rodgers*
_____
**M. CASEY RODGERS**
**UNITED STATES DISTRICT JUDGE**